## Case No. 2,554.

### The CENTURION.

[1 Ware (477) 490.][1]

District Court, D. Maine.   Feb. 21, 1839.

ADMIRALTY JURISDICTION — SALVAGE SERVICE — AUTHORITY OF MASTER TO EMPLOY VESSEL AND CREW — WHO ARE SALVORS — FORFEITURE OF COMPENSATION.

1. A court of admiralty has jurisdiction in cases of salvage to proceed in personam as well as in rem.

[Cited in The Williams, Case No. 17,710; Fox v. Patton, 22 Fed. 747.]

2. It has jurisdiction to carry into execution the decree of another admiralty court.

3. In a case in which the master and crew of a vessel had saved a wreck stranded on the shore, salvage was awarded by arbitrators. No distribution of it was made by the award, but the whole sum was paid to the master. It was held that one of the crew could maintain a libel in the admiralty for a share of the salvage.

[Cited in McConnochie v. Kerr, 9 Fed. 51.]

4. In all cases where services are rendered in saving property in danger of being lost on the high seas, or when wrecked or stranded on the shore, it is in the sense of the maritime law, a salvage service.

[Cited in The A. D. Patchin. Case No. 87; The Pontiac. Id. 8,801; The Independent, Id. 7,014; Harley v. Four Hundred and Sixty-Seven Bars Railroad Iron, Id. 6,068.]

5. When a vessel in the course of a voyage falls in with a wreck, the master is authorized by the general customs and usages of the sea, to employ his own vessel and crew in saving it.

[6. Cited in McConnochie v. Kerr, 9 Fed. 54, to the point that by the maritime law the master has an implied discretionary authority to make such deviations in the interest of commerce and humanity, in order to save endangered life or property.]

7. In such a case, all the crew who are ready and willing to engage in the service, are entitled to a share of the reward, although they may not have gone on board the wreck.

[Cited in Roff v. Wass, Case No. 11,990; Gates v. Johnson, Id. 5,268. Distinguished in McConnochie v. Kerr, 9 Fed. 59.]

[1] [Reported by Hon. Ashur Ware, District Judge.]

5FED.CAS.—24

8. When the master of a vessel, in the course of a voyage, engages in a salvage service, he cannot oppose to the claim of any of his crew, for a share of the salvage, their misconduct during the voyage, if they are guilty of no misconduct during the time they are engaged in the salvage.

[9. Cited in Coffin v. The John Shaw, Case No. 2,949; Adams v. The Island City, Id. 55; Camanche v. Coast Wrecking Co., 8 Wall. (75 U. S.) 478,—to the point that nothing short of a contract to pay a given sum for the services to be rendered, or a binding engagement to pay at all events, whether successful or unsuccessful in the enterprise, will operate as a bar to a meritorious salvage claim.]

[10. Cited in U. S. v. The Mollie, Case No. 15,795, to the point that where a rule existed that the judge should proceed and hear a cause ex parte, according to the regular course of the court, the case should be heard upon evidence produced upon the part of the libellant only.]

In admiralty. This was a libel in personam against the master of the brig Frances Ellen for salvage. The libellant shipped on board the brig at Portland, September 3. 1837, for a voyage to the West Indies and back to the United States, in the capacity of cook and steward. In the prosecution of the voyage the brig arrived at Cardenas in the island of Cuba, and while lying in that port the master was informed that the brig Centurion, of Providence, was ashore in distress, on the coast, at a place about twenty miles distant; and was applied to by persons interested in the Centurion to go with his vessel to her relief, to which he agreed. The Frances Ellen was not then fully discharged, and as is alleged in the libel, and not denied in the answer, he urged the crew to make all the despatch they could in discharging her, in order to proceed immediately to the relief of the Centurion, encouraging them with the promise of a liberal reward as salvage, in case they should succeed. They accordingly proceeded to the Centurion and found her stranded upon a sand-bank. With the aid of some of her crew they took out part of her cargo, and having lightened her, got her off, and proceeded with her in tow to Matanzas. The claim for salvage was there submitted to arbitration, and the arbiters awarded one third of the net proceeds of the sale of the cargo, and one half of the net proceeds of the sale of the vessel; amounting in the whole to about 850 dollars. It does not appear that any distribution of the salvage was made by the arbiters, but the whole was paid to the master, and the distribution left to him, excepting that he was required to pay sixty-two dollars to such of the crew of the Centurion as aided in the salvage; and he paid also eighty-six to the pilot, leaving in his hands about seven hundred dollars. To each of his own crew, except the libellant, he paid seventeen dollars, this being at the same rate as was paid to the crew of the Centurion. Some difficulty arising between him and his owners on his return, he paid over to them the whole of the residue of the salvage money remaining in his hands,

and refused any allowance to the libellant, who having frequently demanded his compensation in vain, brought this libel against the master for his share of the salvage.

Codman & Fox, for libellant.
Mr. Preble, for respondent.

WARE, District Judge. The most familiar form, in which the jurisdiction of this court is exercised over the matter of salvage, is by process in rem; but there is no doubt that the court has authority to adjudicate upon it as well in a proceeding in personam as in rem. The only doubt which can arise in the present case is this; the general question of salvage having been already decided, and the money received by the master acting for all who are interested in it, whether the claim of the libellant is not now converted into a simple debt, for which a remedy lies only at common law. Although the admiralty has a general jurisdiction over maritime contracts and quasi contracts, and things done on the sea, it does not follow that the payment of a debt in every form which it may assume can be enforced in the admiralty, simply because it originated in a contract, or in the performance of a service which was within the jurisdiction of the court. While the original cause or consideration subsists and is in force, the party may have his remedy in this court, but when that is extinguished and the debt passes into a new form, by what in the civil law is called a novation, as when the creditor receives a bond for the sum due, or a negotiable note, or bill of exchange is taken as payment, and as an extinguishment of the debt, it will not be contended that the admiralty has jurisdiction to enforce the payment of the debt in its new form. Ramsay v. Allegre, 12 Wheat. [25 U. S.] 611. In the cases of The Hope, 3 C. Rob. Adm. 215, and The Trelawney, 4 C. Rob. Adm. 223, after the property was saved from the peril, it was redelivered by the salvor to the owners, and a libel was brought against them personally for the reward. The whole question of salvage was therefore open and put in issue. But in this case that question has been already settled. If it had been decided by a regular decree of a court of admiralty by which a specific sum were awarded to the libellant, this court could have taken cognizance of the case, because a court of admiralty has jurisdiction to carry into execution the decree of another court of admiralty. 2 Brown, Civ. & Adm. Law, 120; Penhallow v. Doane's Adm'r, 3 Dall. [3 U. S.] 54; Jennings v. Carson, 4 Cranch [8 U. S.] 2. Whether this court has authority to carry into execution an award of arbitrators, in a matter peculiarly of admiralty and maritime jurisdiction, it is not necessary to decide in this case, because it presents another ground upon which I think the jurisdiction of the court is free from doubt. The libellant in this case does not demand a specific sum which the master is alleged to have received

to his use; he claims generally an unliquidated sum as a reward for his services as a salvor, the amount to be ascertained by a decree of the court. The libel is founded, therefore, strictly upon the maritime service, a consideration over which the court has an undisputed jurisdiction. The question at issue is, whether he performed such services as entitle him to a reward as a salvor or not. The sum in controversy in this case is inconsiderable, and it is understood to be contested by the master of the salvor ship, or rather by the owners, although the suit is nominally against the master, more on account of the principles which it is supposed to involve than the amount in controversy.

In the first place it is questioned, whether this be properly a case of salvage, within the proper import of the term, as it is understood in maritime jurisprudence. At the time when the master of the Frances Ellen was called upon to perform the service, the Centurion was lying aground upon a sand-bank, on the shore, in a state of utter helplessness. He proceeded with his vessel and crew to the place, and found her in this situation, and after some time spent, for the precise time does not appear, in taking out part of her cargo and transferring it to the Frances Ellen, they succeeded in lightening her so much that she was got off the sand and floated. They then took her in tow, and carried her to Matanzas. It does not appear that this business of saving the wreck was attended with any peculiar danger, but this was solely owing to the favorable state of the weather. Had the weather changed and become tempestuous, the peril might have been very great, not only to the salvor vessel, but to all who were engaged in the enterprise. This was a risk which the salvors took upon themselves. After the arrival at Matanzas, the claim for compensation or reward was submitted to arbiters. They manifestly treated it as a case of salvage in the strictest sense of the word, for they awarded not a specific sum as a quantum meruit for the service, but a certain proportion of the property saved. It is true that if a specific sum had been awarded, this would not at all have affected the character of the case, for it is not uncommon for courts to decree a compensation in that form. But the form of the award is referred to, as showing that the arbiters considered the case as one clearly of salvage, and not of affreightment, as is now pretended.

After all this has been done, a direct decision having been made upon this question by a tribunal of the parties' own choosing, and the master and owners having received the sum awarded, it is, to say the least, extremely doubtful whether the question can be brought into controversy in this collateral way, in a case in which the libellant is claiming his share of the reward. But if the question were open to be contested by the master, I have no doubt that the case is, both upon

principle and authority, clearly a case of salvage in the strictest sense of the word. The cases, in which doubts have arisen of this kind, are those in which the service has been performed by pilots, or by the crew of the vessel lost; persons who were in the employment and pay of the owners, and bound by their relation to the vessel to contribute their aid in saving her. Such persons are ordinarily excluded from claiming as salvors; and they are allowed a reward in that character only in peculiar cases, as those of extraordinary peril or gallantry, or when their exertions pass beyond the limits of duty properly required by law. The Joseph Harvey, 1 C. Rob. Adm. 306; Le Tigre [Case No. 8,281]; Hobart v. Drogan, 10 Pet. [35 U. S.] 121; Mason v. The Blaireau, 2 Cranch [6 U. S.] 268; The Two Catharines [Case No. 14,288]. But the salvors in this case were volunteers and were bound by no obligations to the Centurion. In all such cases, where services are rendered in saving property which is in danger of being lost on the high seas, or when wrecked, or stranded on the shore, it is, in the sense of the maritime law, a salvage service, The Emulous [Id. 4,480], and it is quite immaterial whether the salvors accidentally fall in with the wreck, and volunteer their services, or are called upon by the owners, or persons interested in the wreck, to aid in saving it. It is the place where the property is situated, and the circumstances of exposure and peril in which it is found, that determine the question whether it is a case of salvage or not.

But whether this case is considered as one of salvage or otherwise, the right of the libellant to maintain this libel would not be materially affected. He contracted to perform a particular voyage. The master had no right under this contract to change the voyage for another, nor to add to it an intermediate voyage, unless it was authorized by some usage of trade. He certainly had no authority under the contract, to require the libellant to proceed upon a wrecking enterprise. To such an order he might say "non in haec foedera veni." If he consented to go, he would be justly entitled to an extra compensation, as well upon the ground that it was a service of peculiar hazard, as upon the general principles which govern maritime courts in the distribution of salvage. And in fact such a reward was expressly promised by the master in this case. I do not mean to say when a vessel in the course of her voyage falls in with a wreck, and the master thinks proper to make an attempt to save it, that the seamen are not bound to obey him; on the contrary, I hold that they are. The customs and usages of the sea, silently assented to by the whole maritime world, appear to authorize the master in such cases to employ his vessel and crew in rescuing from destruction property thus exposed. The Boston [Case No. 1,673]. It is an authority that is allowed in the general interest of commerce; and the invariable custom of courts of maritime jurisdiction is to remunerate and encourage such services by a liberal and generous reward. But though the authority for engaging in such enterprises rests solely in the discretion of the master, yet he is considered as acting not for himself alone, but for the common benefit of all who participate in the risk. In the distribution of the salvage, the owners are compensated for the use of their vessel, and the crew for their share of the peril and labor. It is a service which is not contemplated in the contract with the crew, and which they are not by the terms of the contract bound to perform, but it is a duty imposed by the policy of the law, and the law compensates them for it by a liberal reward. In the present case, as the service in which their vessel was employed was not embraced within the contract with the crew, and was one which might have been attended with great peril, I am clear that the crew was entitled to a specific compensation beyond the rate of their wages for the time. The master himself so understood it at the time, for he promised the crew a share of the salvage as an inducement for them to engage in it.

Another ground of defence, particularly relied upon in the answer, is that the libellant actually performed no part of the service in saving this property; that he was never on board the Centurion; that he performed no part of the labor in removing her cargo to the Frances Ellen; but was employed during the whole time in his ordinary duty of cook and steward. This is the precise objection that was made to the claim of part of the crew of the salvor ship in the case of The Baltimore, 2 Dod. 132. Sir William Scott, in that case, said: "With respect to the contest which exists between those who went on board the Baltimore and became the immediate instruments of preserving her, and those who remained on board their own ship, I confess I can see no ground for making a distinction between them, and consider it but fair to hold that they are all equally entitled to be rewarded. All of them, it is true, did not go on board the Baltimore, but they were all, with one exception, ready to do so; and a selection of a part of them became necessary, which was accordingly made, and I have no doubt properly, by their commander. As all concurred in their readiness to go, they are all equally deserving of reward." The man who refused to go on board the Baltimore was of course excluded from all share in the salvage, but all who are willing to share in the labor were held equally entitled, and it appears to me for reasons perfectly satisfactory. It was necessary for some to remain on board the salvor ship, and the master selected such as he thought proper to go out of her to save the wreck. The same observations ap-

ply to the present case. The master proposed to the crew to go on this enterprise, to which they agreed, and when they arrived at the wreck he selected such as he thought proper to engage in the immediate agency of transferring the cargo of the Centurion to the Frances Ellen. The libellant was as ready as the rest of the crew to embark in the enterprise; nor does it appear that he refused to perform any duty that was required of him. It was the choice of the master that he should remain on board the Frances Ellen, and if he had not, prudence, I presume, would have required that another man should.

It is alleged as a third objection to the libellant's maintaining this suit, that he "conducted himself on board the said Frances Ellen in a disorderly and disobedient manner, refusing to perform his duty, threatening to poison the crew, breaking and destroying property, and finally wholly refusing to return in said Frances Ellen, so that this respondent was compelled to discharge him on account of his misconduct as aforesaid These are, without doubt, grave charges, and if they could apply to affect the claim set up in this case, would deserve to be carefully considered. But none of this disorderly conduct is charged as having occurred while they were engaged in the business of the salvage. Now without adverting to the insufficiency of the proof with respect to most of the charges, my opinion is, that the misconduct of the libellant in the course of the voyage, if proved, cannot be resorted to as a reason for forfeiting his claim for salvage, when no misconduct is proved during the time they were employed in this service. This was an enterprise apart from the voyage for which he shipped, and his previous offences, although they might affect his claim for wages, cannot be imported into this new and distinct enterprise, though springing up in the course of the voyage, to impair his claim for a share in the reward.

Upon the whole I can see no legal ground upon which the libellant can be excluded from the claim set up in this libel; no evidence has been introduced which goes to distinguish the merits of one man from another. The service does not appear to have been attended with any peculiar danger, nor to have afforded occasion for the display of extraordinary gallantry. The libellant remained on board the Frances Ellen. This was of course by order of the master. No evidence is offered to show that, during the period employed in saving the wreck and bringing her into port, he declined any duty which was required of him. As I see no reason for making a distinction between this man and the rest of the crew, I shall allow him the same sum which the master allowed to the others with costs.

Decree of seventeen dollars and costs.