## Case No. 6,290.

### The H. B. FOSTER.

[Abb. Adm. 222; [1] 6 N. Y. Leg. Obs. 223.]

District Court, S. D. New York. April 22, 1848.

SALVAGE—TOWAGE—AGREEMENT AS TO COMPENSA-
TION — COMPENSATION IN ABSENCE OF AGREE-
MENT — OFFER TO PAY — EQUITABLE BAR TO
COSTS.

1. There is no determinate rule of law abso-
lutely distinguishing towage service from sal-
vage service.

2. Salvage service is such service as is ren-
dered in rescue or relief of property at sea, in
imminent peril of loss or deterioration.

3. Towage service is aid rendered in the pro-
pulsion of a vessel, &c., irrespective of any cir-
cumstances of peril.

4. Towing may be a salvage service, when
performed in aid of a vessel in distress.

[Cited in The M. B. Stetson, Case No. 9,363.]

5. Where there is a hiring or bargain bonâ
fide, and free from fraud or mistake, for aid to
be rendered by one vessel to another in dis-
tress, the terms of such agreement are adhered
to as the rule of compensation; but where no
agreement is made, the rate of remuneration
for such services is to be governed by the con-
siderations applicable to salvage cases.

[Cited in Adams v. The Bark Island City,
Case No. 55; Coffin v. The John Shaw, Id.
2,949.]

6. A vessel laden with a valuable cargo, be-
ing overtaken by a storm while entering the
harbor of her port of destination; was left by
her crew, wholly crippled and unnavigable, and
in a situation where a recurrence of severe
weather might have produced a total loss, yet
lying in the mouth of the harbor and within
ready reach of assistance. A steamer, engaged
in the business of towing vessels to and fro in
the harbor, went out to her relief, reaching her
just as another steamer of like occupation was
approaching, with a view to render similar as-
sistance, and took her in tow and brought her
up to the wharf; the entire time consumed be-
ing five hours, and the severity of the storm
having abated. Held, that this was a case for
salvage compensation, and not one of mere tow-
age service.

[Cited in Roff v. Wass, Case No. 11,999.]

7. It was not a case of legal derelict, nor one
entitling the salvors to extraordinary compensa-
tion.

8. Two hundred and fifty dollars was a rea-
sonable compensation for the service rendered.

9. A mere attempt to negotiate a compromise
of a claim at an amount specified, unaccom-
panied with a tender or direct offer to pay such
amount, does not operate as an equitable bar to
costs.

[Cited in The Camanche v. Coast Wrecking
Co., 8 Wall. (75 U. S.) 477; Ehrman v. The
Swiftsure, 4 Fed. 467.]

This was a libel in rem, by Oroondates
Mauran and others, the master and owners
of the steamboat Samson, against the schoon-
er H. B. Foster, to recover compensation for
salvage services rendered to that vessel.

W. K. Thorn and W. Q. Morton, for libel-
lants.

---

[1] [Reported by Abbott Brothers.]

Francis B. Cutting, for claimants.

I. The libellants have not established a
case which entitles them to any extraordi-
nary compensation for their services. Al-
though, upon the afternoon of Saturday, they
had reason to believe that the lives of those
supposed to be on board of the schooner were
in jeopardy, they both declined to assume
any risk or hazard themselves, and neglect-
ed to impart their information to others who
might have volunteered to assist those then
believed to be in distress.

II. The case lacks all the elements of a
case of meritorious salvage service, as these
elements are stated in The Clifton, 3 Hagg.
Adm. 120. Nor are there any circumstan-
ces connected with the towing of the schoon-
er which entitle libellants to any unusual
compensation. No lives were saved, and the
schooner was in perfect safety when the
steamboat reached her.

III. The conduct, on Sunday morning, of
those on board the steamboat, shows, in sev-
eral particulars, more eagerness to secure a
prize than to save property. 1. Another
steamboat was on her way, and was in sight
of the schooner. The libellants, in their
haste, slipped the cables, and left the schoon-
er without ground tackling to protect her in
case of accident. 2. They omitted the obvi-
ous duty of attaching a buoy to the anchors,
so as to mark the spot where they were left.
Their excuse that the anchors were twisted,
ought not to avail them, because they made
no effort to extricate them. They pretend
that they could not find the brakes of the
windlass; but there ought to have been
handspikes or other means belonging to the
steamboat by which the anchors could have
been extricated.

IV. In The Neptune, 1 W. Rob. Adm. 300,
it was held that salvors must show that they
possessed skill commensurate with their vo-
cation and condition in life, and adequate
to the demands of the service which they un-
dertook to perform. In the present case, it
appears that the Samson started for the
relief of a vessel in distress, with a crew
short by one man, and ignorant of the sound-
ings and navigation, and without handspikes
or other means to get up anchors.

V. The steamboat was absent, engaged in
rendering the service, only about five hours.
Under the circumstances, the libellants ought
to be allowed little if any more than a mere
remuneration pro opere et labore. The case
can scarcely be considered a case of salvage
service; and if it was something more than
mere towage, the schooner having sustained
some damage, yet the compensation ought
not greatly to exceed towage compensation.
The Reward, 1 W. Rob. Adm. 174; The H. M.
S. Thetis, 3 Hagg. Adm. 62. Here the claim-
ants offered $150, or three times the ordinary
compensation allowed by the usage of the
harbor for towage for an equal length of
time; and went so far as to inquire if $250

would be satisfactory, intimating a willingness even to pay that sum to avoid litigation. The libellants ought to have accepted this offer, or at all events to have manifested some disposition to settle upon reasonable terms; instead of which they hastened to file their libel, and demanded fifty per cent. on the vessel and cargo.

VI. Even in cases of derelict, the rule is not invariable that one half should be awarded. The principle, as now established, is, that a reasonable compensation shall be given; but the amount is discretionary. Abb. Shipp. 555.

VII. The schooner was not a legal derelict. She was fastened by her anchors within the bay of New York. The spes recuperandi was not gone, nor was the animus revertendi abandoned. Her crew intended, as the testimony shows, to have returned. Under these circumstances she was not derelict. The Bee [Case No. 1,219]; The Upnor, 2 Hagg. Adm. 3.

E. Paine, for claimants of the cargo.

BETTS, District Judge. The libellants, owners and master of the steamboat Samson, for themselves and others, demand a salvage compensation for the relief and rescue of the schooner H. B. Foster and her cargo.

The facts upon which the decision rests, only will be stated; and they, upon the pleadings and proofs, are these:

The schooner, on March 26, 1847, arrived inside of Sandy Hook from St. Croix, with a cargo of sugar, rum, and molasses, of about $12,000 value. The schooner was worth from $1,600 to $2,000, dismantled, and about $3,000 when fitted for sea.

She anchored under the west bank at about half-past seven, p. m. It came on to blow a gale, with a heavy storm of snow and rain; and during the night the schooner dragged her anchors, and continued to drag the next day, till half-past one, p. m. The masts were cut away at eight a. m. Wind was N. and W. N. W.

About three o'clock in the afternoon of the next day, (Saturday, the 27th,) the storm ceased and the wind moderated. The schooner struck bottom two or three times after the masts were cut away, but not with violence, and no injury was produced by it. She made no water in consequence. She had dragged a distance of two and a half miles to the eastern bank, and brought up in from thirteen to fifteen feet water, at nearly low tide, on her outside, and about eleven feet on the shoalest side, and distant about four miles from Coney Island, and six or seven from Sandy Hook.

The sea broke over her the last time at about three, p. m., and at about four, p. m. she struck once. The pilot stated that the master and crew were frightened at her striking. When she last struck, the master jumped from his berth, and said, "This won't do; we must go ashore." The crew all rushed to go ashore. All on board, nine in number, immediately left the schooner in a small boat for Sandy Hook, taking nothing from the vessel. The wind was still blowing hard, and so as to render it, in the opinion of the pilot, very dangerous to attempt going to Sandy Hook, a distance of six or seven miles, in that boat,—more dangerous even than to remain with the schooner. The next morning (Sunday) the wind was fresh, but not so as to render it dangerous for steamboats to navigate the bay, or to go to and alongside the schooner.

The principal employment of the steamboat Samson is to tow vessels to sea from New York, and in from sea to the port, and also to go to the assistance of vessels within and outside the harbor, requiring aid. When engaged for such service, her compensation is $10 per hour, from the time of leaving on the expedition to her return. This is the common rate allowed steam-tugs in the harbor for that description of services, others also being engaged in it. When no bargain is made, and either party refuses to be governed by the customary price, the rate is adjusted upon the principle of a quantum meruit.

About noon on Saturday, the schooner was seen by a person residing near the lighthouse on Staten Island. He went to the wharf of the libellants on the island, to give notice of her situation. A letter was written to the master of the Hercules, (another steamer employed in towing, &c., and owned by the owners of the Samson,) then in New York, superscribed to be "on urgent business." In the absence of the master of the Hercules, it was delivered to the master of the Samson, between four and five, p. m., of that day.

It stated: "There is a vessel of about 200 tons lying in the lower bay, with all her masts gone. She is between the east bank and Romer, and requires immediate assistance, as the sea is making a complete breach over her, rendering it impossible for her to be seen, except at intervals."

The wind at the time was blowing so heavily that the master of the Samson declined going down, and said he should not be able to assist another vessel, or do more than take care of his own boat in such weather, but he would go for her if the wind lulled.

Steam was put on the boat, and she was kept in a condition to leave till between nine and ten, p. m. The master then left her and went to his house, with orders to have steam on again at four the next morning. He was called at that hour, but considered the wind too violent to justify his going out. At five, he concluded the wind had abated; he got under way for the schooner, and finding he could navigate safely, he kept on slowly to her, and reached her between seven and eight, a. m. These are the representations on the part of the libellants.

The weight of evidence in the case is, decidedly, that the weather at that time had become moderate, so as to render it perfectly safe for boats of the size and power of the Samson to go to and from the schooner, and tow her in any part of the bay. She was brought up to the quarantine in tow by the Samson, a little after nine o'clock, and the whole time she was engaged in going and returning to the city was about five hours.

The tug was run close to the quarter of the schooner, near enough for one of the men to jump on board. A hawser was secured to the bow of the schooner, her cables slipped, (being foul, which rendered it difficult to raise her anchors promptly,) and she was then towed up to the city, without impediment or difficulty.

This general outline of the facts is sufficient to bring under consideration the two main questions on the merits discussed between the counsel. These are—first, whether the services rendered the schooner were salvage services or mere towage—and, second, if they are regarded as salvage services, whether the schooner was at the time derelict, so as to entitle the salvors to the scale of compensation usually applied in cases of derelict.

I am not aware of any determinate rule of law which discriminates towage service from salvage. It is manifest that circumstances may exist rendering towage the most efficient, if not the only service, which can be afforded in saving property and life. A dismantled and disabled ship of large burden, filled with passengers, may be thus rescued by a very small vessel, wholly inadequate even to receiving on board the sufferers on the wreck. It has, therefore, never seemed to me that any advance was made towards solving the question, whether a service was salvage in its character, and to be rewarded as such, by proving that it was performed by towing only.

If there is any intrinsic difference between towage and salvage, it would appear to be only that salvage service must always be that given in rescue or relief of property in imminent peril of loss or deterioration, while towage may be applied merely in aid of a vessel against adverse winds or tides, or in difficult passages, while she is in possession of her ordinary powers of locomotion.

Sir Stephen Lushington says, in the case of The Reward, 1 W. Rob. Adm. 177: "Mere towage service is confined to vessels that have received no injury or damage, and mere towage reward is payable in those cases only where the vessel receiving the service is in the same condition she would ordinarily be in without having encountered any damage or accident."

In that case, a ship going to sea grounded. She was got off with the loss of her two best anchors and cables, and with the starboard end of the windlass and bulk-head carried away. She was proceeding back to repair damages, when she fell in with a steam-tug, and accepted its services to tow her into the dock. She tendered £17, which was the rate established for towing (greater distances) by the company owning the tug. The tender was refused, and the court held the service was salvage, and awarded £80. 1 W. Rob. Adm. 176. See, also, 2 W. Rob. Adm. 294.

In The London Merchant, 3 Hagg. Adm. 396, £400 salvage was allowed a steam-tug for towing a vessel off the rocks and into harbor. See, also, The Meg Merrilies, 3 Hagg. Adm. 346, and note. No other assistance than towing was rendered by The United Kingdom, and £800 salvage was awarded. Id. 401, note; S. P., The Earl Grey, Id. 363; The Traveller, Id. 370.

Sir John Nicholl lays down the rule, that if towage leads to the rescue of a vessel from danger, it should be remunerated as salvage. The Isabella, 3 Hagg. Adm. 428. In The Industry, Id. 203, £143 salvage was awarded a pilot smack for towing a brig into Cowes' roads. See, also, The Sussex, Id. 339.

The condition of the schooner was such, when the Samson came to her, as to constitute the assistance given her a salvage of vessel and cargo, in the proper acceptation of the term. She was utterly unmanageable and helpless, and without a crew or guard to protect her and the cargo. It was no less so than if the libellants had boarded the schooner, fitted up masts, sails, and steering apparatus, and brought her into port by such means of self-navigation, or had even transferred her cargo to the steamer. The difference would only have been in the greater amount of labor, exposure, and peril. So, also, compensation is awarded upon a common principle, whatever may be the method by which the relief is effected.

The cases above cited afford sufficient exemplifications of the application of the rule, where the service has been by towing, to dispense with the necessity of fortifying it by further references.

When there is a hiring or bargain, bona fide, without fraud or mistake, the terms of such agreement are adhered to as the rule of compensation. But if no agreement is made, settling the terms on which aid will be given by one vessel to another in distress, remuneration is awarded with regard to considerations appropriately governing salvage cases. The Britain, 1 W. Rob. Adm. 40; The Betsey, 2 W. Rob. Adm. 167; The True Blue, Id. 176; The Mulgrave, 2 Hagg. Adm. 71; The Traveller, 3 Hagg. Adm. 372. The same principle may be considered as involved in The Zephyr, 2 Hagg. Adm. 43. Sir John Nicholl, however, intimates that if an engagement even were made to tow, unforeseen circumstances may convert such towage into a salvage service. The Isabella, 3 Hagg. Adm. 428.

On the second topic of discussion, I do not deem it important to review the cases relied upon on each side, or weigh very scrupulous-

ly the facts or principles connected with the subject; for if it be conceded that the schooner for the time being, and when taken in charge, was technically a derelict in respect to her crew, that circumstance would in no way determine the scope of compensation to which the libellants would be entitled. Abb. Shipp. 660, notes.

She was not derelict, in the sense of being at the time helpless of relief except by the aid of these libellants. She lay safely at anchor in the bay. The danger of the storm was over. She had been seen the day previous from Staten Island, and that morning she was visible from Sandy Hook, and, of course, would be from the nearer vicinity of Coney Island and Staten Island. Another steamboat was directly in the rear of the Samson, going down the bay, for the purpose, among other objects, of looking out for this schooner. The Boston [Case No. 1,673].

Contingencies might occur in her then condition and position, making it highly desirable and advantageous to her to be immediately taken into port. But prospective and possible calamities which might attend her remaining there, do not constitute a case of imminent peril, especially where other resources for aid and relief are at hand. The Emulous [Id. 4,480].

The circumstances amount, in my judgment, simply to a case of salvage of a vessel laden with a valuable cargo, wholly crippled and unnavigable, and placed in a situation where a recurrence of severe weather might have produced a total loss; but lying in the mouth of her port of destination, at anchor, and within ready reach of assistance, with competent aid going to her relief, and already very near to her, when the libellants took her in possession.

But I regard the allegation of the defence set up that the steamer Duncan C. Pell was surreptitiously prevented by the libellants from relieving the schooner, as not supported by the proofs. There is probable cause to suspect it was known on board the Samson that the Pell contemplated running to this wreck, but it being proved that other vessels in the vicinity were aground, or injured from the effects of the storm, there might be reasonable grounds with the master of the Samson to suppose the Pell was not specially destined to the schooner, and was out on a general adventure, to give assistance where it might be desired. It was well known to the Samson that the Pell was employed ordinarily in towing vessels, and affording them assistance as required.

Both steamers were wreckers as well as towing-boats, and it is to be assumed, that after the tempest, they would, in pursuit of their vocation, be on a cruise to render aid wherever it might be needed, and that their object would be mutually well understood; and neither was bound to give place to the other, and avoid visiting a wreck which she supposed her competitor might intend going

to. Although this fact does nor take away a just claim to compensation, it is certainly not without influence in determining whether the interposition of the Samson was valuable to the salved vessel, in an eminent degree; and so, also, it becomes an element of weight in determining the salvage to be awarded.

The particulars in evidence in the cause tend to diminish any claim to extraordinary compensation for the services rendered. Had the Samson gone down and relieved the schooner and her crew on Saturday afternoon, when apprised of their situation, her gallantry and exposure in the act, equally with the rescue of life and property, then in serious hazard, would have entitled her to the highest grade of reward. The Clifton, 3 Hagg. Adm. 117. But on Sunday, so far as the danger to the steamboat or her crew, or the safety of those on board the schooner was concerned, the aspect of things was wholly changed. The libellants, as is most natural, magnify their labors and exposure, but facts independent of their testimony demonstrate that the service could have been no more than a very ordinary one, for with less than her full complement of men, the tug ran the distance to the wreck, fastened to her, and towed her alongside of the wharf in New York, in five hours.

The evidence of other witnesses on the bay at the time shows the weather to have become fine, and it is also to be remarked that the Samson was not taken from or delayed in other business, or subjected to hazard which might jeopard her insurance as if only a passenger or freight boat, for this was no more than part and parcel of her daily and ordinary employment in towing vessels in and out of the harbor, or giving assistance to those in distress.

The original libel, filed on the 2d of April, alleged, "that on Sunday morning, March 28, about 6½ o'clock, as the libellant, &c., in the steamboat Sampson, was going down below the Narrows to look for vessels coming in and needing a towboat, he discovered the schooner," &c.

This averment was substituted on the 15th by an amendatory one, alleging that the boat went down in consequence of a previous notice, &c.; but the claimants have a right to invoke that allegation as an admission on record, attested by oath, in corroboration of evidence showing that the tug did not go out of her common line of business, or assume a hazard beyond what was incident to her calling, and was anticipated; and no fair ground for doubt exists that if she had been applied to by any person interested, she would have gone down and towed in the schooner that morning, for the usual compensation of $10 per hour.

No such agreement having been made, she is now entitled to lay the case before the court, and demand payment commensurate to the merit of the act, considered as a salvage service.

The claimants impute to the libellants a want of due skill and care in not raising the anchors of the schooner, and also in slipping the cables without attaching buoys to them; and that they have been compelled to pay other wreckers $75 for searching for and raising the anchors, and restoring them to the schooner. I think, however, on the proofs, that as the cables were foul, and considerable time must have been necessary to extricate them and raise the anchors, and as the tide was falling, and there might be danger, in case of a slight swell, that the schooner in that depth of water would ground on the bank so as either not to be easily moved off, &c., or by thumping to spring a leak, to the injury of the cargo, the course taken by the libellants was prudent and justifiable, not to risk the vastly greater value of vessel and cargo for the purpose of saving the anchors, even if their total loss might ensue from slipping the cables. Such loss was not to be apprehended, as the shoalness of the water and the known position of the schooner would leave little doubt that they could be easily recovered in calm weather.

After the libel was filed, the owner of the schooner sought a compromise with the libellants. He claimed that they were responsible to him for the value of the anchors and chaincables, but proposed to settle the matter by relinquishing that claim, and paying $150. That proposition they peremptorily refused. He then inquired whether an offer of $250 would be accepted, and was given to understand that would be rejected also.

The libellants claim a large percentage upon the proved value of the schooner and cargo, say, $14,000; and, on the argument, it is put at from one third to one moiety, the familiar allowance in cases of derelict or desperate stranding. Abb. Shipp. 666, note 1.

Enough has already been stated to evince that the court does not regard the libellants entitled to any extraordinary compensation. I have perused all the cases cited, in which the subject has been passed upon; but it is manifest, that beyond the recognition of the general principles composing the doctrine of salvage reward, and a few facts of a pervading and permanent character which may serve as guides to the discretion of the courts, the cases must each have been determined essentially upon particulars peculiar to itself.

Other circumstances being alike, steamboats, as having the ability to render more prompt and efficacious assistance than sail vessels, are encouraged by a more liberal reward. The Raikes, 1 Hagg. Adm. 246. This is most rightfully so, when they turn aside from their voyage, or leave other pursuits to go as mere volunteers to vessels in distress.

This doctrine has certainly less force applied to them as professional wreckers and towers. Their intrinsic superiority to sail vessels for such service, will secure them the preference in that employment when they can be obtained, and thus the calling of itself will be sufficiently encouraging and advantageous, without the aid of the stimulus of high salvage rewards.

At most, in reference to mere harbor service, and that rendered about the mouths of their own ports, it is by no means manifest, that steamers whose regular pursuit is to tow and relieve vessels, should be regarded as meriting a reward out of all relation and proportion to what would have been accepted as satisfactory on a fair bargain for their services. When the steamer is employed under contract, she receives full pay, whether she brings in the vessel she is sent for or not, and of consequence can afford to place a lower price on her employment than if the enterprise was entirely at her own expense and risk. This consideration should not be overlooked in measuring the reward in this case, where the libellants assumed the hazard of wasting the day at their own charge, with, perhaps, exposure of the boat and her machinery to more or less damage; and it certainly would tend to retard their adventuring in like undertakings without the security of an express promise, if they, after assuming the hazard and expense and loss of time without reward, were still to be left, as to compensation, on the same footing as if under regular hire.

Giving the most liberal weight to these considerations, and viewing this case in the light of its special circumstances, I shall award the libellants $250, and their taxed costs.

No offer of payment was made by the claimants in such manner as to operate an equitable bar to costs. No more was done by the claimant than attempt at negotiation for compromise. On failing in this he should have made a regular tender, if he relied upon his offer as amounting to full satisfaction of the demand.

The charge of embezzlement against the libellants I consider fully repelled by the proofs. Decree accordingly.