HUME v. J. D. SPRECKELS & BROS. CO.

(Circuit Court of Appeals, Ninth Circuit. March 17, 1902.)

No. 681.

**1. Salvage—Salvage or Towage Service—Towing Leaking Schooner into Port.**

Where a schooner had sprung a leak by reason of striking a bar at the mouth of a river while being towed out to sea, which made it necessary to resort to the pumps, and, in the judgment of the master, to put into an intermediate port for repairs, but she was unable to reach such port by sail, owing to head winds, the service of a tug in towing her in was a salvage service, and entitled to be compensated as such.[1]

**2. Same—Amount of Award—Review on Appeal.**

The amount awarded by the trial court for salvage services will not be reduced by an appellate court, unless for violation of just principles, or for clear and palpable mistake, or gross overallowance.

Appeal from the District Court of the United States for the District of Oregon.

Dolph, Mallory, Simon & Gearin (R. H. Countryman, of counsel), for appellant.

Nathan H. Frank, for appellee.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

MORROW, Circuit Judge. On October 20, 1898, a libel was filed in the district court of the United States for the district of Oregon against the schooner Berwick by J. D. Spreckels & Bros. Co., a Cal-

---

[1] Salvage awards in federal courts, see note to The Lamington, 30 C. C. A. 280.

ifornia corporation, for the sum of $850. Upon the trial of the action a decree was entered in favor of the libelant for $500 and costs. From this decree the claimant, R. D. Hume, has appealed.

It is alleged in the libel that the libelant corporation is, and was during the time mentioned, the owner of the steam tug Escort, which tugboat is and has been engaged in the business of towing vessels in and out over the Columbia river bar; that on October 6, 1898, the said tugboat was moored at a wharf in the port of Astoria, Or., and about midnight the employés on the tug saw distress signals being fired at sea; that steam was immediately gotten up on said tugboat, and at 20 minutes after 12 o'clock at night the said tugboat left the port of Astoria, crossed the bar, and went out about 12 miles to sea, where she discovered the schooner Berwick loaded with lumber and in a sinking condition, and in tow of a steamer called the Fulton. It was alleged that the Berwick on the preceding day, October 5, 1898, had struck on the Tillamook bar while going out to sea, had sprung a leak, and begun rapidly to take water; that, arriving near the Columbia river bar, she was taken in tow by the steamer Fulton, but said steamer, not desiring to enter the port of Astoria with said schooner, held her off the bar, and fired signals of distress to attract attention in the port of Astoria, in answer to which the said tugboat went to the assistance of the said schooner; that at the request of the master of the said schooner the said tugboat took the schooner in tow, paid to the steamer Fulton $100, the amount demanded by it for the services it had performed, and thereupon towed the said schooner into the port of Astoria, where it arrived at about 9 a. m. on the morning of October 6, 1898. It was alleged that the services performed by the said tugboat were reasonably worth the sum of $750, and that, in addition thereto, the libelant was entitled to be paid the $100 advanced as aforesaid to the steamer Fulton. The answer of the claimant, R. D. Hume, as owner of the schooner Berwick, denied that the tugboat Escort took the said schooner in tow at the request of the master of said schooner, and averred the facts in relation to the towing of said schooner to be substantially as follows: That on October 4, 1898, the schooner Berwick left the port of Nehalem, Or., in tow of a steamer, having on board a cargo of lumber, and being bound for the port of San Francisco, Cal.; that while being towed over the bar the schooner struck, and shortly afterward the steamer let go its hawser, and the schooner proceeded to sea without said steamer; that about 20 minutes afterwards it was discovered that said schooner had sprung a leak; that the weather was calm, and at 5 o'clock a. m. of October 5th said schooner was outside of the Columbia river bar, where she lay until about 5:30 p. m. of said day, when the steamer Fulton came alongside and offered to tow said schooner to Astoria that evening for the sum of $250; that this offer was refused, the master of the schooner offering to pay $100 for the service, which was in turn refused by the master of the steamer; that the master of the steamer then proposed to leave the compensation to be paid for such towage service to be adjusted between the owners of the respective vessels; that this offer was accepted, and thereupon said steamer passed her hawser to said schooner, and towed said schooner until about 9 p. m. of said

day; that the master of said steamer then ordered the sails of the schooner to be taken down, saying that they would lay by until daylight; that at 4:15 a. m. on the morning of October 6th the tug Escort hove in sight, and came alongside; that the master of the steamer ordered his hawser let go, and the Escort passed her hawser to the schooner, and towed her into port, arriving there at 8 o'clock of that morning. It is averred that the towage service so performed by the tug Escort was so performed at the request and for the benefit of said steamer Fulton, and in pursuance and fulfillment of the towage contract entered into with said steamer Fulton hereinbefore set forth, and not at the instance or request of said schooner Berwick or her owner. It is further averred that at the time when this service was performed the schooner Berwick was not in distress or danger.

The court found, as matters of fact: That about midnight of October 6, 1898, upon being notified that signals of distress were being fired out at sea, the master of the tugboat proceeded out to sea on said tug, and at about a distance of 10 miles off the Columbia river (being about 30 miles from Astoria) he found the Berwick, loaded with about 138,000 feet of lumber, leaking badly, but in tow of the steam schooner Fulton. That said schooner, while in tow of a tug on October 5, 1898, had struck heavily on a bar at the mouth of the Nehalem river. That the leak was not discovered until the tug had let go of the schooner. That a signal of distress was hoisted, which attracted the attention of the Fulton, then on its way to San Francisco. That the Fulton spoke to the schooner, and the master of the schooner asked to be towed into the Columbia river, which the master of the Fulton offered to do for $250, but the master of the schooner declined, and offered $100 for the service. The master of the Fulton declined that offer, but proposed to tow the schooner into the Columbia, and leave the price to be settled by the respective owners of the vessels, and that proposition was accepted. That the Fulton took hold of the schooner, and started in with her, arriving at the mouth of the Columbia after dark; but it was very clear, the moon was shining brightly, and objects could be plainly seen on the water. The Fulton started in with her tow, but the schooner was well filled with water and towed badly; and the Fulton did not have sufficient power to handle her properly, and she drifted out of the channel. That thereupon the master of the Fulton, fearing the tow would go ashore, turned and went out to sea and anchored, where they were found by the tug Escort as aforesaid. That the master of the Fulton proposed to the master of the Escort that he should be paid $100 for the services thus far of the Fulton, and that the Escort should tow the Berwick into Astoria. That the master of the Escort paid the Fulton $100, and took the Berwick in tow, and towed her safely to a dock in Astoria, where her cargo was discharged, and her damages repaired. That said schooner Berwick was of the value of $5,000. That the Berwick was so badly injured that she could not have lived at sea, nor could she have gotten into port without the aid of the Escort, and the services performed by the Escort were salvage services. That the sum of $500 was a reasonable sum to be allowed for the services rendered by the tug Escort to said schooner Berwick.

The evidence in support of the finding of fact that the Berwick was so badly injured that she could not have lived at sea, and could not have gotten into port without the aid of the Escort, was based upon the testimony of two witnesses who testified in the presence of the court. One of these witnesses was Samuel B. Randall, the agent of the libelant at Astoria in charge of its two tugs, the Escort and Rescue. His testimony upon this subject was substantially as follows:

"She was leaking very badly,—so much so that they had to keep all of the pumps at work while she was lying at the wharf, to keep her from sinking; and at the same time they had to discharge cargo. She was loaded with lumber, and they discharged the cargo of lumber and repaired the vessel. The schooner was in such a condition that she could not possibly have lived at sea, nor could she have made any port without the assistance of the tugboat."

The other witness was E. B. Howe, the master of the Escort, who testified that:

"She was leaking very badly, and could not possibly have lived but a very short time at sea; nor could she have sailed into the Columbia river, as the wind was blowing off shore."

It may be said that these witnesses were not disinterested, and that their testimony should be considered with some degree of caution. But there was evidence on the part of the claimant tending to support their testimony. The witness Cornelius Anderson, who was master of the Berwick, testified upon cross-examination as follows:

"Q. I notice in this extended protest that you say you found two heavy streams coming in in the fore peak. Is that the fact? A. Oh, yes; you could see some coming in at both sides. Q. How much water did you have in when you arrived off the Columbia bar? A. I could not say. Q. Did you sound it? A. I could not sound it. Q. Why could you not sound it? A. We have no particular way of sounding it. The only way I could see there would be that, if it had extended above the skin of the vessel, I could have seen it in the fore peak. If the water had been above the skin, I could have discovered it forward. * * * Q. I suppose you kept your men at the pumps all the time, both day and night? A. Mostly all the day. * * * Q. You were not bound for Astoria? A. I was not bound there. I went in there on account of getting the vessel's leaking looked after. I didn't know what might happen on the way down, and I would not take any chances on going down on account of the vessel leaking. I did not know what might take place, so I thought I would go into Astoria, and do what I could do there. Of course, I didn't fancy it would be good policy to go on to San Francisco like that."

The assignments of error cover practically the entire field of the findings of fact by the court below. Considering the matters therein involved in their logical order, the first question that arises is, was the service performed by the tug Escort for the Berwick a salvage service, or a mere towage service? "Salvage service" has been defined as the service rendered in relieving property from an impending peril of the sea, by the voluntary exertions of those who are under no legal obligations to render such service. Williamson v. Alphonso, 30 Fed. Cas. 4; The Centurion, 5 Fed. Cas. 369; The M. B. Stetson, 16 Fed. Cas. 1,273; The H. B. Foster, 11 Fed. Cas. 948. "Towage service" has been defined as the service rendered to a vessel that has received no injury or damage. The Reward, 1 W. Rob. Adm. 177. It is the employment of one vessel to ex-

pedite the voyage of another. The Princess Alice, 3 W. Rob. Adm. 138. It is an undisputed fact that the schooner Berwick, while being towed out to sea from the Nehalem river, hit upon the bar, and so strained her timbers that a leak resulted, and it became necessary to resort to the pumps. While in this condition she accepted assistance in a towage service to the port of Astoria. Under the accepted doctrine of the authorities referred to, a case is presented of salvage service; and the next consideration must be, of what order or grade was this service, and what is a sufficient compensation for it?

It appears from the evidence that the schooner Berwick, after having been towed across the spit at the entrance to the Nehalem river, discovered that a leak had been sprung. The master decided to sail for Astoria and make repairs, instead of continuing to San Francisco, the port of discharge. This was about 2 o'clock in the afternoon. There was only a light wind, and they did not reach the Columbia river bar until about 7 o'clock the next morning. By the use of the pumps, the water had not gained any, and the schooner was in condition to sail. But owing to the light winds it was difficult to sail into the river, so a flag was raised to attract the attention of passing vessels, the pumping was continued when necessary, and the schooner lay outside of the harbor until late in the afternoon, when the steamer Fulton came along and asked what was wanted. The master of the schooner first asked the steamer to report the schooner to its owners in San Francisco, telling them its condition, and that it was going in to Astoria. The master of the steamer was indignant at being stopped for such a request, and, after a few remarks to that effect, said, "Don't you want to get towed in to Astoria?" The master of the schooner replied, "Yes; I figure on getting towed if I can't sail." The steamer's master offered to tow the schooner in for $250. The schooner's master said he would give but $100. The steamer's master then said he would take the tow, and leave the bargain to be settled by the respective owners of the vessels in San Francisco. This the schooner's master agreed to, and the tow was entered upon. The steamer continued towing the schooner until about 8 o'clock that evening, and then ordered the schooner to haul down sails; saying they would lay around there until daylight. They remained in this condition, crossing in and out among the buoys, and retaining about the same position, until after 4 o'clock the next morning, when the tugboat Escort came out from Astoria, and went alongside the steamer. The captain of the steamer testifies that the captain of the tugboat came on board the steamer, and talked over with him the matter of taking the tow off his hands; that the captain of the steamer said, as he had already lost about eight hours' time, he would lose a little more, and take the schooner in himself; that the captain of the tugboat asked if any signal lights had been burning, or rockets fired, and, upon learning that there had not, he said he did not like to come out for nothing, and again asked for the tow. The captain of the steamer consulted with his mate, and upon considering that by giving the tow over to the tugboat the steamer

could reach San Francisco in the morning, and save a day's work, he offered to release the tow if the captain of the tugboat would give him $100 for the work already done by the steamer. According to his testimony, the bargain was made as follows:

"I said: 'I expect to get closer to $250 than to $100 for the tow after she is landed in Astoria. If you are willing to take it on those conditions, and give me $100, you can have her.' He hemmed and hawed a little while, and he says: 'Well, rather than go back empty, I will take her.' So he went up into the purser's room with me, and the purser made out a check, and the captain of the tugboat signed it,—a check on Spreckels. Q. For what amount was that check? A. $100. Q. What occurred then? Did he do anything? A. He went aboard his vessel, and bid me 'Good morning,' and went back to the Berwick and asked the Berwick to let go the line. The captain of the Berwick sent his mate forward, and he said, 'Will I let go of the hawser, captain?' Says I, 'Yes; he will tow you in, and everything will be all right.' That is all. After that I proceeded on my way to San Francisco."

He further states that in the conversation the captain of the tugboat said "he thought, if he could get as much out of it as I did, it would pay him for coming out there." The master and mate of the schooner Berwick state that the tugboat, after it had been lying by the steamer Fulton for a while, came up to the schooner, and the captain called out, "Let go the steam schooner's hawser." The master of the Berwick directed the mate to ask the captain of the Fulton about it. This was done, and the captain of the Fulton replied, "Yes; let go my hawser, and take the towboat's." This question and response were made through the speaking trumpets. The schooner then let go of the hawser of the Fulton, and took that of the tugboat, without any further conversation between the parties, other than a query from the captain of the tugboat as to whether the schooner was full of water, to which the master of the Berwick replied, "No." The tugboat then proceeded to tow the schooner into Astoria, arriving there about 8 o'clock in the morning. The captain of the tugboat denies that the captain of the Fulton told him of any contract between himself and the schooner, and says that the captain merely said that he thought his boat should be paid something for the services already rendered, and that $100 was finally agreed upon as a proper sum, and paid. The owners of the Escort demanded $750 for the service, and the repayment of the $100 paid to the Fulton in addition. The owners of the Berwick contended that $250 should be the limit of their liability. The court below awarded the owners of the Escort $500, as compensation for a salvage service.

It follows from the review of the testimony herein made that we find sufficient evidence to support the findings of the court below as to the facts in the case. We are of opinion that the testimony on behalf of the claimant does not discredit the claim that a substantial salvage service was rendered the Berwick, in distress, by the steamer Fulton and the tug Escort, and that, under the circumstances of this case, both these services should be treated as one continuous salvage service. The agreement reached between the masters of the Berwick and the Fulton, that the latter should tow the Berwick into the Columbia river, and leave the compensa-

tion to be settled by the owners of the Fulton and the Berwick, was not limited by the previous offer of the master of the Fulton to perform the service for $250. That offer was rejected, as was the offer of the master of the Berwick to pay $100 for such service. It remained, then, for the owners of these two vessels to agree upon the compensation to be paid for the services rendered the Berwick, or, failing in this, to have the question determined by the court. The question submitted to the court was one with respect to which different minds might reach different conclusions as to the amount of salvage to be decreed. The rule in such a case was stated in The Connemara, 108 U. S. 359, 2 Sup. Ct. 758, 27 L. Ed. 751, as follows:

"In The Sybil, 4 Wheat. 98, 4 L. Ed. 522, Chief Justice Marshall said: 'It is almost impossible that different minds, contemplating the same subject, should not form different conclusions as to the amount of salvage to be decreed, and the mode of distribution.' And by the uniform course of decision in this court, during the period in which it had full jurisdiction to reverse decrees in admiralty upon both facts and law, as well as in the judicial committee of the privy council of England, exercising a like jurisdiction, the amount decreed below was never reduced, unless for some violation of just principles, or for clear and palpable mistake, or gross overallowance. Hobart v. Drogan, 10 Pet. 108, 119, 9 L. Ed. 363; The Comanche, 8 Wall. 448, 479, 19 L. Ed. 397; The Neptune, 12 Moore, P. C. 346; The Carrier Dove, 2 Moore, P. C. (N. S.) 243; Id., Brown. & L. 113; The Fusilier, 3 Moore, P. C. (N. S.) 51; Id., Brown. & L. 341."

We find no such reason for reducing the judgment in the present case. The decree of the district court is therefore affirmed.