**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

VITOL, S.A.,

*Plaintiff - Appellant,*

v.

PRIMEROSE SHIPPING COMPANY LTD;
SPARTACUS NAVIGATION
CORPORATION,

*Defendants-Appellees,*

and

CAPRI MARINE, LTD; STARLADY
MARINE LTD; LASSI SHIPPING
COMPANY LTD; OCEAN CARRIER
MARITIME CORPORATION; DEEP BLUE
MARITIME, S.A.; AMARILIS SHIPPING
COMPANY; AURORA MARITIME;
GERASSIMOS KALOGERATOS, a/k/a
Gerrassimos Kalagiratos, a/k/a
Gerassimos Kalogiratos; IOANNIS "
JOHN " KALOGERATOS, a/k/a Ioannis
"John" Kalagiratos, a/k/a Ioannis
"John" Kalogiratos; MARIA
VIAGGINI; NIKOLAOS KOUTSOKOSTAS,

*Defendants,*

No. 11-1900

v.

INCHCAPE SHIPPING SERVICES; JOHN
S. CONNOR, INCORPORATED,

*Garnishees.*

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Marvin J. Garbis, Senior District Judge.
(1:09-cv-03430-MJG)

Argued: September 20, 2012

Decided: February 8, 2013

Before MOTZ, AGEE, and THACKER, Circuit Judges.

Affirmed by published opinion. Judge Agee wrote the opinion, in which Judge Motz and Judge Thacker joined.

## COUNSEL

**ARGUED:** Lawrence Jay Kahn, FREEHILL, HOGAN &
MAHAR, New York, New York, for Appellant. Patrick F.
Lennon, LENNON MURPHY CAULFIELD & PHILLIPS,
LLC, New York, New York, for Appellees. **ON BRIEF:**
Alexander M. Giles, SEMMES, BOWEN & SEMMES, Balti-
more, Maryland, for Appellant. Nancy R. Siegel, LENNON
MURPHY CAULFIELD & PHILLIPS, LLC, New York,
New York; Geoffrey S. Tobias, OBER, KALER, GRIMES &
SHRIVER, Baltimore, Maryland, for Appellees.

## OPINION

AGEE, Circuit Judge:

Vitol, S.A. ("Vitol") brought the underlying action in the district court against Spartacus Navigation Corp. ("Spartacus") and Primerose Shipping Company ("Primerose") (collectively "S&P") seeking to "pierce the corporate veil" and enforce a judgment against S&P it had previously obtained against Capri Marine, Ltd. ("Capri Marine"). After determining that its exercise of admiralty jurisdiction was proper, the district court granted motions to dismiss and to vacate attachment filed by S&P. For the reasons stated below, we affirm the judgment of the district court.

### I.

#### Background and Proceedings Below

In September 2000, the vessel ALAMBRA was involved in a marine pollution incident ("the Oil Spill") while in port in the country of Estonia. The ALAMBRA was owned by Capri Marine and chartered by Vitol at the time of the Oil Spill. Vitol brought suit against Capri Marine in the English High Court of Justice, Queen's Bench Division, Commercial Court, alleging that Capri Marine breached certain warrantees of seaworthiness resulting in the Oil Spill and resulting damages. Vitol prevailed in the English court, and obtained a judgment in 2005 against Capri Marine in the amount of $6.1 million plus costs and interest ("the English Judgment"). The English Judgment remains unpaid and now totals over $9 million with accrued interest. During the English litigation, the ALAMBRA was sold for scrap by Capri Marine to Aurora Maritime ("Aurora") for approximately $2 million.

In 2009, Vitol filed a verified complaint (the "Verified Complaint") against S&P in United States District Court for the District of Maryland alleging that S&P (as well as other

named but not joined defendants)[1] were alter egos of Capri Marine, thereby seeking to enforce the English Judgment against S&P. In conjunction with its Verified Complaint, Vitol filed a motion, pursuant to Rule B(1)(a) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions of the Federal Rules of Civil Procedure (the "Supplemental Rules"), requesting an *ex parte* order for issuance of process of maritime attachment, and prayed that the district court attach the vessel M/V THOR (then docked at Baltimore, Maryland), owned by Spartacus.[2]

The district court granted the motion and issued an *ex parte* order attaching the THOR. Shortly thereafter S&P entered a restricted appearance in the district court, posted a security bond, and reached a stipulation for the THOR's release by paying approximately $9 million into the district court as substitute collateral for the THOR (the "THOR Substitute Collateral").[3] Subsequently, S&P moved to vacate the attachment, pursuant to Supplemental Rule E, and to dismiss the Verified Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

By order entered February 23, 2010, the district court granted the motions to vacate the attachment and dismiss the Verified Complaint (the "2010 Order"). In the 2010 Order, the district court addressed its jurisdiction over the action, as S&P contended that Vitol failed to state an admiralty claim and

---

[1]Capri Marine, Gerassimos Kaligaratos, and other related entities were named as defendants in Vitol's alter ego suit against S&P. These defendants, however, have not been served, were not parties to the district court proceedings, and are not parties to this appeal.

[2]Vitol sought Supplemental Rule B attachment of the THOR to initiate the underlying *quasi in rem* action against the defendants, S&P, who could not be found in the District of Maryland. *See* Fed. R. Civ. P. Adm. Supp. R. B(1)(a).

[3]Although the THOR is owned by Spartacus, it is managed by Primerose as a part of the Primerose fleet.

therefore the district court lacked jurisdiction over the proceedings.

The district court determined that the action filed by Vitol sounded in admiralty even though the English Judgment was issued by the Commercial Court of the English High Court of Justice, not the English Admiralty court. The district court based its ruling on expert witness declarations stating that the underlying English action (relating to the Oil Spill) sounded in admiralty under English law, and could have been brought either in the Commercial or Admiralty court in England. On that basis, the court concluded Vitol's choice of forum in England was not dispositive for purposes of admiralty-based jurisdiction.

Having concluded it possessed competent jurisdiction in admiralty over the proceeding, the district court then held that Vitol had failed to state a claim upon which relief may be granted, and dismissed the Verified Complaint pursuant to Rule 12(b)(6). In early 2011, however, the district court granted Vitol leave to amend and Vitol filed an amended verified complaint (the "Amended Verified Complaint"), and stayed release of the THOR's Substitute Collateral. The Amended Verified Complaint contains the allegations relevant to this appeal.

Although the Amended Verified Complaint contains some thirty pages of detailed allegations related to Vitol's alter ego claim against S&P, the gravamen of that claim can be distilled into a short summary: Capri Marine is owned by Starlady Marine Ltd. ("Starlady"), an entity that is in turn controlled by Gerassimos and Ionnas Kalogiratos. Aurora, the company to which the ALAMBRA was sold for scrap, is actually a dummy corporation owned and operated as part of the Kalogiratos Group—a group of related shipping entities under the control of the Kalogiratos family. After the ALAMBRA was sold to Aurora, Aurora sold the ALAMBRA to a third party (for approximately $3 million), and the proceeds from

the sale were used to pay down one of Capri Marine's loans, but not paid towards the Oil Spill damages. Primerose, which is owned by Nicholas Velliades (a non-party), was allegedly established with the remaining proceeds of the ALAMBRA sale. Velliades, the nominal principle of the Primerose fleet, is alleged to be a mere puppet of Gerassimos Kalogiratos ("Gerassimos"). Primerose uses the office facilities of Starlady without charge, engages in extensive comingling of funds and makes undocumented, uncollateralized, and unrepaid loans to Starlady or members of the Starlady fleet. In addition, Spartacus, which is also nominally controlled by Velliades, also shares office facilities with Primerose and Starlady, and put up no funds to secure the release of the THOR from attachment. Rather, the THOR Substitute Collateral was provided by Primerose.

S&P again moved to vacate the attachment and dismiss the Amended Verified Complaint. In an August, 22, 2011 order (the "2011 Order"), the district court granted both motions, although it did conclude that Vitol had alleged sufficient facts to support a reasonable belief that Capri Marine is an alter ego of Gerassimos. The court pointed to allegations that Capri Marine was substantially undercapitalized at the time of the Oil Spill, that Capri Marine did not hold business meetings or keep corporate minutes, and that Gerassimos orchestrated the sale of the ALAMBRA to Aurora "for less than fair market value with the intent to defraud Capri [Marine]'s creditors, including [Vitol]." (J.A. 1563).

The court went on to conclude, however, that Vitol had failed to allege with sufficient particularity in the Amended Verified Complaint that S&P were alter egos of either Gerassimos or Capri Marine. The court discussed allegations made by Vitol that Gerassimos, not Velliades, was the "real" owner of Primerose (and related entities) and concluded that the allegations demonstrated only that Velliades' companies have a close relationship with Gerassimos' companies, but a close relationship is not sufficient as a matter of law to prove alter

ego status. Further, the court found that dividends paid to the Kalogiratos family from their interest in Deep Blue Maritime S.A. ("Deep Blue") (another company principally owned by Velliades) did not "directly relate to Primerose or Spartacus and[ ]therefore [are] not probative as to whether Primerose or Spartacus are alter egos of Gerassimos." (J.A. 1569).

Because the Amended Verified Complaint failed to make a plausible allegation with sufficiently particularized facts (in accordance with Supplemental Rules B and E) that S&P are alter egos of Capri Marine, the district court found no basis for the further attachment of the THOR's Substitute Collateral and vacated the attachment. The court also found that the allegations were insufficient to show a plausible basis for relief pursuant to Rules 8 and 12, and granted the motion to dismiss the Amended Verified Complaint.

Vitol noted a timely appeal, posted a supersedeas bond, and the district court has stayed the order vacating the attachment of the THOR's Substitute Collateral pending appeal. We have jurisdiction pursuant to 28 U.S.C. § 1291.

On appeal, Vitol claims that the district court erred in vacating the attachment of the THOR and dismissing Vitol's Amended Verified Complaint for failure to state a claim. S&P respond that the district court was without jurisdiction to entertain the complaint in the first instance, and we should affirm the judgment in their favor on that ground. Alternatively, S&P argue that should the jurisdictional ruling be affirmed, the district court correctly held that Vitol's pleadings fail to state a claim upon which relief can be granted. We address the jurisdictional matter first, as we must verify jurisdiction in order to proceed. *See Sucampo Pharms., Inc. v. Astellas Pharma, Inc.*, 471 F.3d 544, 548 (jurisdiction is a "threshold" issue that must be resolved prior to resolving "an issue relating to the merits of the dispute, such as failure to state a claim").

## II.   Jurisdiction

An issue of the district court's subject matter jurisdiction is a question of law that the Court reviews *de novo. See North Carolina ex rel. Cooper v. Tenn. Valley Auth.*, 515 F.3d 344, 347 n.1 (4th Cir. 2008).

S&P assert that the district court's exercise of jurisdiction over this case was improper for two reasons. First, S&P contend the English Judgment is not an admiralty decree, and thus the district court here, sitting only in admiralty, lacked subject matter jurisdiction. Second, even if the district court had admiralty jurisdiction, S&P argue that Supplemental Rule B is a "pre-judgment" remedy only and could not be used to secure the appearance of a party once the English Judgment had been entered. We disagree with S&P's contentions and hold the district court did not err in its determination of jurisdiction.

### A.   Admiralty Jurisdiction

Congress has vested the district courts with, *inter alia*, original jurisdiction over "[a]ny civil case of admiralty or maritime jurisdiction." 28 U.S.C. § 1333. Central to this appeal, then, is the question of whether Vitol's Amended Verified Complaint sounds in admiralty so as to invoke the district court's admiralty jurisdiction under § 1333.

It is well recognized that federal courts in the United States possess jurisdiction in admiralty over claims to enforce a foreign admiralty judgment. *See, e.g.*, 1 Benedict on Admiralty § 106 ("[A]dmiralty jurisdiction in the United States may be broadly stated as extending to . . . any claim to enforce a judgment of a foreign admiralty court."). Even in the earliest days of the Republic, the Supreme Court confirmed that the courts of the United States possess jurisdiction to recognize the admiralty decrees of foreign admiralty courts. *See Penhallow v. Doane's Adm'rs*, 3 U.S. (3 Dall.) 53, 97 (1795) (Iredell, J.)

("It was clearly shown at the bar, that a Court of Admiralty, in one nation, can carry into effect the determination of the [C]ourt of Admiralty of another.").

American courts have long and consistently held that admiralty jurisdiction was well-founded to enforce the judgments of foreign admiralty courts. *See, e.g.*, *Otis v. The Rio Grande*, 18 F. Cas. 902, 903 (C.C.D. La. 1872) (No. 10,613), *aff'd* 90 U.S. 458 (1874) ("This court is in duty bound to carry into effect the sentences and decrees, not only of other federal courts, but even of the admiralty courts of foreign countries . . . ."); *The Jerusalem*, 13 F. Cas. 559, 563 (C.C.D. Ma. 1814) (No. 7,293) (admiralty court "will enforce a foreign maritime judgment between foreigners, where either the property or the person is within its jurisdiction"); *Int'l Sea Food Ltd. v. M/V Campeche*, 566 F.2d 482, 485 (5th Cir. 1978) (citing *The Centurion*, 5 F. Cas. 369, 370 (No. 2,554) (D. Me. 1839)) ("[A]n admiralty court has jurisdiction to enforce any judgment of another admiralty court . . . .").

While acknowledging this established precedent, S&P assert that it is inapplicable here because the English Judgment is not an "admiralty judgment" so as to be entitled to recognition by the admiralty courts of the United States. This is so, S&P argue, for two reasons. First, the Commercial Court (rather than the Admiralty Court) of the English High Court of Justice, Queen's Bench Division, issued the English Judgment. Second, in any event, the English Judgment, having been reduced to a judgment debt, is now merely a monetary award that itself lacks any maritime character.

### B.   Choice of English Forum

The thrust of S&P's first argument is that because Vitol elected to pursue legal action against Capri Marine in the Commercial Court of the English High Court of Justice, rather than the Admiralty Court, the English Judgment was not an

admiralty judgment and therefore no admiralty jurisdiction can exist in the case at bar. We do not agree.

Vitol and S&P proffered declarations to the district court from their respective experts on English law. Those experts agreed that the type of maritime claim brought by Vitol against Capri Marine could have been brought in *either* the Commercial Court or the Admiralty Court. Julia Dias, *Spartacus'* own expert, averred that there is a "considerable overlap between admiralty claims falling within the Admiralty jurisdiction of the High Court . . . on the one hand, and commercial claims on the other." (J.A. 136-37). Dias went on to state that "[Vitol] properly and legitimately elected to commence proceedings and pursue its claim in the Commercial Court rather than the Admiralty Court as it was entitled to do[,]" and noted that "it is entirely commonplace in my experience for claims such as Vitol's which involve issues of unseaworthiness to be brought in and heard by the Commercial Court." (J.A. 138). Finally, Dias stated that "[h]ad Vitol elected to bring the claim in the Admiralty Court, it would almost certainly have proceeded and been handled in much the same way as it actually was." (*Id.*).

Vitol's expert on English law, Luke Parsons, offered a substantially similar declaration with respect to the structure of the English Admiralty and Commercial Courts. Parsons agreed with Dias' assessment that Vitol's claim against Capri Marine could have been brought in either court, and similarly described the jurisdictional overlap between the two. Parsons concluded "the claim made by Vitol in this case, is an 'admiralty claim' within the meaning of [English Law] and are claims which the Admiralty Court and Commercial Court both have the jurisdiction and expertise to hear." (J.A. 360).

The expert declarations are illuminating, particularly to the degree the experts of the adverse parties are in agreement concerning the application of English law. These expert declarations, considered together, plainly demonstrate that Vitol's

action against Capri Marine could have been brought in the English Admiralty Court, i.e., that it was an admiralty claim as that term is understood by the courts of England. S&P, however, ask this Court to hold that the choice of forum in England, not the subject matter of the underlying claim, is dispositive of whether jurisdiction lies with the district court pursuant to 28 U.S.C. § 1333. In other words, S&P contend that Vitol's choice of forum in the English Commercial Court for an otherwise valid admiralty claim there divests any resulting judgment of its admiralty character in this country so it can no longer be considered as an admiralty matter. We find this argument unpersuasive and unsupported.

The approach advocated by S&P, which looks purely to form at the expense of substance, is unsupported by citation to any case as authority for its position. Indeed, the dispositive question is not whether the English Judgment issued from an "admiralty court," but rather, whether the claim itself is maritime in nature. *See Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B.*, 825 F.2d 709, 713 (2d Cir. 1987) ("[A]n admiralty court has jurisdiction of a claim to enforce a foreign judgment *that is itself based on a maritime claim.*") (emphasis added). Inasmuch as the English Commercial Court exercised jurisdiction over a maritime claim, we agree with the district court's conclusion that "the Commercial Court was an admiralty court with respect to the English Judgment." (J.A. 991-92).

## C.   Reduction to Monetary Award

We also reject S&P's separate contention on appeal that because the English Judgment has been reduced to a monetary award it now lacks the maritime character necessary to being considered an admiralty judgment which would deprive the district court of jurisdiction in this proceeding. The Fifth Circuit's decision in *Int'l Sea Food Ltd. v. M/V Campeche*, 566 F.2d 482 (5th Cir. 1978) is instructive on this issue.

In *Capmeche*, the sole issue before the court was "whether a United States district court has subject matter jurisdiction in

admiralty to enforce a foreign maritime decree which awarded monetary damages to the plaintiff on a claim for collision." 566 F.2d at 483. In finding the district court possessed jurisdiction, the Fifth Circuit looked to *The Centurion*, 5 F. Cas. 369 (D. Me. 1839) (No. 2,554), which addressed the jurisdiction of an admiralty court to enforce a monetary award made in an arbitration arising out of a salvage dispute. The *Centurion* court reasoned that

> [a]lthough the admiralty has a general jurisdiction over maritime contracts and quasi contracts, and things done on the sea, it does not follow that the payment of a debt in every form which it may assume can be enforced in the admiralty, simply because it originated in a contract . . . which was within the jurisdiction of the court[,]

5 F. Cas. at 370, and concluded that admiralty jurisdiction did not lie to enforce the arbitration agreement award. The *Centurion* court noted, however, that if the underlying matter "had been decided by a regular decree of a court of admiralty by which a specific sum were awarded to the libellant, this court could have taken cognizance of the case, because a court of admiralty has jurisdiction to carry into execution the decree of another court of admiralty." *Id.* Thus, the fact that the debt at issue in *The Centurion* arose from an arbitration award was dispositive. Had the debt been established by way of an admiralty court judgment, then admiralty jurisdiction would be present in a subsequent proceeding to enforce that judgment.

The *Campeche* court thus read the language of *The Centurion* to "suggest[ ] that an admiralty court has jurisdiction to enforce any judgment of another admiralty court *regardless of its lack of maritime flavor*." 566 F.2d at 485 (emphasis added). The Fifth Circuit accordingly held that the district

court possessed jurisdiction over the money-judgment enforcement action in that case.[4]

In light of *Campeche*, we are persuaded that the fact that the judgment Vitol ultimately seeks to recognize is now a monetary award does not defeat the district court's admiralty jurisdiction because that prior judgment was rendered by a competent court sitting in admiralty. Consistent, therefore, with a long line of cases confirming American admiralty jurisdiction over actions to enforce foreign admiralty judgments, we reject S&P's argument that the district court lacked admiralty jurisdiction over Vitol's action.

## D.    Supplemental Rule B

S&P's next contention is that Supplemental Rule B could not be used to attach the THOR. In S&P's view, since they were not parties to the English Proceeding resulting in the English Judgment, the current action is only a post-judgment enforcement action against them and not a maritime claim subject to Supplemental Rule B. In support of their argument, S&P recite language from the Second Circuit's decision in *Williamson v. Recovery Ltd. Partnership*, 542 F.3d 43, 48 (2d Cir. 2008), which states, *inter alia*, that attachment pursuant to Supplemental Rule B is recognized as a "prejudgment mechanism used by parties in admiralty cases to secure jurisdiction over an absent party and to obtain security for potential judgment where the absent party's assets are transitory."

---

[4]S&P urge us to distinguish *Campeche* on the grounds that the underlying dispute revolved around the interpretation of a maritime insurance contract. Thus, the subsequent trial in that case would involve issues of a maritime flavor.

While S&P correctly recite an additional rationale for the *Campeche* court's decision, they are incorrect to suggest that the presence of a second justification somehow undermines the primary basis of jurisdiction: that the money judgment was the decree of an admiralty court. Indeed, the *Campeche* court squarely addressed the identical issue before this Court in the case at bar and we find its rationale persuasive.

We find S&P's reading a strained construction and contrary to a long line of precedent in admiralty cases.

Supplemental Rule B provides in pertinent part:

> If a defendant is not found within the district when a verified complaint praying for attachment and the affidavit required by Rule B(1)(b) are filed, a verified complaint may contain a prayer for process to attach the defendant's tangible or intangible personal property—up to the amount sued for—in the hands of garnishees named in the process.

Fed. R. Civ. P. Adm. Supp. R. B(1)(a).[5]

Initially, we note that the limitation suggested by S&P, i.e., that Supplemental Rule B must be strictly construed as a pre-judgment remedy, does not appear in the text of the rule.

---

[5]The Second Circuit has provided a useful history of the maritime attachment process that aids in our analysis of S&P's argument.

> Maritime attachment is a feature of admiralty jurisprudence that antedates both the congressional grant of admiralty jurisdiction to the federal district courts and the promulgation of the first Supreme Court Admiralty Rules in 1844. *Aurora Mar. Co. v. Abdullah Mohamed Fahem & Co.*, 85 F.3d 44, 47 (2d Cir.1996). In fact, "[t]he use of the process of attachment in civil causes of maritime jurisdiction by courts of admiralty . . . has prevailed during a period extending as far back as the authentic history of those tribunals can be traced." *Atkins v. The Disintegrating Co.*, 85 U.S. (18 Wall.) 272, 303, (1874). The power to grant attachments in admiralty is an inherent component of the admiralty jurisdiction given to the federal courts under Article III of the Constitution. U.S. Const. art. III, § 2. The power's historical purpose has been two-fold: first, to gain jurisdiction over an absent defendant; and second, to assure satisfaction of a judgment. *Swift & Co. Packers v. Compania Colombiana Del Caribe, S.A.*, 339 U.S. 684, 693 (1950).

*Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.*, 460 F.3d 434, 437-38 (2d Cir. 2006).

Rather, the plain wording of the rule itself requires only that the defendants not be present in the district wherein the Rule B prayer is filed, and that the plaintiff file an affidavit in accordance with Supplemental Rule B(1)(B) that the prospective defendant's property is present in the district. In this case, Vitol has unquestionably complied with both requirements. Indeed, in *Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.*, the Second Circuit opined that where a plaintiff has satisfied the two-part Supplemental Rule B(1)(B) test, a district court should only vacate attachment in "limited" circumstances: "that [the defendant] would be subject to *in personam* jurisdiction in an adjacent district, that [the defendant] was located and subject to personal jurisdiction in the same district as [the plaintiff], or that [the plaintiff] had already obtained sufficient security." 460 F.3d 434, 447 (2d Cir. 2006). S&P do not assert that any of those limited circumstances are present here. Therefore, we conclude the language of Supplemental Rule B did not on its face bar the THOR's attachment.

As the district court recognized, ample precedent reflects that Supplemental Rule B has been used to attach admiralty defendants' property in actions to enforce a foreign admiralty judgment. *See, e.g.*, *Campeche*, 566 F.2d at 483 (finding admiralty jurisdiction where Supplemental Rule B used to garnish judgment debtor's proceeds in district); *Good Challenger Navagante S.A. v. Metalexportimport S.A.*, No. 06-cv-1847 (KMK), 2006 U.S. Dist. LEXIS 97920, at *1 (S.D.N.Y. July 24, 2006) (upholding Supplemental Rule B attachment in action to enforce the judgment of English Commercial Court); *Pink Goose (Cayman) Ltd. v. Sunway Traders LLC*, No. 08-cv-2351 (HB), 2008 WL 4619880, at *1 (S.D.N.Y. Oct. 17, 2008) (upholding Supplemental Rule B attachment in action to enforce foreign arbitration award).

S&P, however, emphasize that courts have described Supplemental Rule B as a "pre-judgment" remedy, *e.g.*, *Williamson*, 542 F.3d at 48, and argue that it should not be used in a case such as this, where a judgment has already issued from

a foreign admiralty court, and Vitol's claim is one to collect on that judgment. We believe, however, that "pre-judgment," as it is used in the Supplemental Rule B context, must be understood to mean prior to the judgment in the particular case where a plaintiff seeks to use Supplemental Rule B. It makes little, if any, sense to construe Supplemental Rule B otherwise when centuries of settled hornbook admiralty law establish that "admiralty jurisdiction in the United States may be broadly stated as extending to . . . any claim to enforce a judgment of a foreign admiralty court." Benedict, *supra*, § 106; *see also Penhallow*, 3 U.S. at 97 (Iredell, J.) ("It was clearly shown at the bar, that a Court of Admiralty, in one nation, can carry into effect the determination of the [C]ourt of Admiralty of another.").

Vitol seeks, as an absolutely necessary condition precedent to an action to enforce the English Judgment, a prior separate and independent judgment against S&P that those entities are the alter ego of Capri Marine and/or the Kalogiratos group. "It is well established that an admiralty court can review questions of . . . alter ego." *Ost-West-Handel Bruno Bischoff GMBH v. Project Asia Line, Inc.*, 160 F.3d 170, 174 (4th Cir. 1998) (citing *Swift & Co. Packers v. Compania Colombiana Del Caribe*, 339 U.S. 684, 689 n.4 (1950)). Attachment of the THOR under Supplemental Rule B is thus clearly a pre-judgment mechanism in the sense which establishes jurisdiction over S&P for adjudication of the alter ego dispute. This seems the logical conclusion here as Vitol's prayer in the Amended Verified Complaint is for judgment against S&P as the alter ego of Capri Marine. Only armed with that initial judgment can Vitol proceed to enforce the English Judgment.

Moreover, it would be difficult to understand the long line of cases, discussed *supra* at 8-9, extending the admiralty jurisdiction of the United States district courts to actions to enforce the decrees of foreign admiralty courts, if the limitation suggested by S&P was correct. We simply do not believe, based on the text of Supplemental Rule B and the long line

of admiralty precedent, that a plaintiff seeking to enforce a foreign admiralty judgment could avail itself of the courts of admiralty in the United States, yet be deprived of the use of the district court's power to attach assets: an "inherent component of the admiralty jurisdiction given to the federal courts." *Aqua Stoli*, 460 F.3d at 437.[6]

*In re Stolt-Nielsen Transp. Grp. B.V.*, No. 06 Civ. 703 (NRB), 2008 WL 650391 (S.D.N.Y. Mar. 7, 2008), *aff'd sub nom. Stolt-Nielsen Transp. Grp. v. Lio Yag Sanayi Ve Ticaret A.S.*, 330 F. App'x 207 (2d Cir. 2009) (unpublished), cited by S&P in support of their construction of Supplemental Rule B, actually lends support to the construction that we adopt. In that case, the plaintiff initially brought the complaint against the defendant without Supplemental Rule B attachment, apparently because the defendant was located within the district. The defendant left the district and a default judgment was ultimately entered in favor of the plaintiff. Thereafter, the plaintiff attempted to use Supplemental Rule B to attach the defendant's property. The court rejected the plaintiff's attempts, finding that because a default judgment had already been entered by the court, "[plaintiff's] motion is essentially a plea for us to allow it to use [Supplemental] Rule B as [a] judgment collection device." *Id.* 2008 WL 650391, at *2.

By contrast, the district court in the case at bar had not entered any judgment against S&P at the time the *ex parte* motion for Supplemental Rule B attachment was filed by Vitol. What Vitol sought was to establish jurisdiction through Supplemental Rule B in the District of Maryland so its under-

---

[6]Had Vitol already obtained a judgment in the district court against S&P and at a later time then sought to attach their assets to satisfy a previously docketed judgment, in that circumstance, Vitol's attempt to use Supplemental Rule B might be seen as a prohibited post-judgment action. In that limited circumstance, Vitol might be required to use other attachment or judgment enforcement procedures in lieu of Supplemental Rule B. However, that situation is not present in this case and we need not speculate here on what decision would be required should those events occur.

lying alter ego complaint could be adjudicated; not to enforce the English Judgment in the first instance, although we are not at all certain that usage is barred by the Rule. In any event, Vitol's use of Supplemental Rule B was entirely consistent with the rule's purpose: "to permit the attachments of assets wherever they can be found and not to require the plaintiff to scour the globe to find a proper forum for suit or property of the defendant sufficient to satisfy a judgment." *Transportes Navieros y Terrestres S.A. de C.V. v. Fairmount Heavy Transp. N.V.*, 572 F.3d 96, 103 (2d Cir. 2009).

Accordingly, we reject S&P's arguments either that the district court lacked admiralty jurisdiction or that the attachment of the THOR was a misuse of Supplemental Rule B.

## III.    The Merits

Turning to the merits of this appeal, Vitol argues that the district court erred in concluding that the Amended Verified Complaint failed to adequately plead a claim under Rule 8 of the Federal Rules of Civil Procedure or Supplemental Rule E(2)(a). Under Rule 8(a), a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations, quotation marks, and alterations omitted). A district court should dismiss a complaint pursuant to Rule 12(b)(6) if, accepting all well-pleaded allegations in the complaint as true and drawing all reasonable factual inferences in the plaintiff's favor, the complaint does not allege "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. Under Rule 12(e), a "party may move for a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response."

By contrast, Supplemental Rule E(2)(a), the governing pleading standard for Supplemental Rule B proceedings,

states that "the complaint shall state the circumstances from which the claim arises *with such particularity that the defendant or claimant will be able, without moving for a more definite statement, to commence an investigation of the facts and to frame a responsive pleading*." (emphasis added).

The remedy for failure to comply with the pleading standards of Supplemental Rule E(2)(a) is set forth in Supplemental Rule E(4)(f), which provides that "[w]henever property is arrested or attached, any person claiming an interest in it shall be entitled to a prompt hearing at which the plaintiff shall be required to show why the arrest or *attachment should not be vacated* or other relief granted consistent with these rules." Fed. R. Civ. P. Adm. Supp. R. E(4)(f) (emphasis added). Thus, the primary remedy afforded for failure to comply with Rule E(2)(a) is vacatur of the attachment. Dismissal of the complaint is not a Rule E remedy. *See Chiquita Int'l Ltd. v. MV BOSSE*, 518 F. Supp. 2d 589, 596 (S.D.N.Y. 2007) ("Rule E(4)(f) allows a motion for vacatur of attachment, but does not provide for dismissal.").

Counsel for S&P, however, suggested at oral argument that dismissal of the complaint automatically flows from vacatur of the Supplemental Rule B attachment because, absent Supplemental Rule B attachment, the court lacks jurisdiction over S&P. Oral Argument Audio Recording at 33:30.[7] This argument fails as a matter of law.

In *Republic National Bank of Miami v. United States*, 506 U.S. 80 (1992), the Supreme Court rejected the notion that, in an *in rem* civil forfeiture action, the district court's continued

---

[7]Although it appears that S&P did not previously advance the argument that dismissal of the complaint flows automatically from vacatur of the attachment, we address the argument because it implicates the subject matter jurisdiction of the district court and "[s]ubject matter jurisdiction cannot be forfeited or waived." *See In re Kirkland*, 600 F.3d 310, 314 (4th Cir. 2010).

control of the *res* is necessary for the court to retain jurisdiction over the forfeiture proceedings. *See id.* at 84. In that case, following a civil forfeiture proceeding in which the Government prevailed, the United States Marshal transferred the *res* (the proceeds of a sale of certain assets) from his control to the United States Treasury. *Id.* at 83. Although the claimant timely appealed from the judgment against it, the claimant did not move to stay execution of the judgment or post a supersedeas bond. Once the assets were removed from the court's control, the Government sought to dismiss the claimant's appeal for lack of jurisdiction. The court of appeals granted the motion to dismiss the appeal, but the Supreme Court reversed.

After a lengthy discussion of both maritime and forfeiture cases, the Supreme Court held that "[s]tasis is not a general prerequisite to the maintenance of jurisdiction. Jurisdiction over the person survives a change in circumstances." *Id.* at 88. The seizure of the *res*, the Court concluded, "and the publication of the monition or invitation to appear, is regarded as equivalent to the particular service of process in the courts of law and equity." *Id.* at 85. In sum, while control over the *res* is a prerequisite to initiation of the *in rem* action, the court does not need to continuously possess the *res* to maintain jurisdiction once established.[8]

The *in rem* principle articulated in *Republic National Bank* has been extended to *quasi in rem* proceedings, including those arising under Supplemental Rule B. *See Stevedoring*

---

[8]The Court acknowledged that "if a defendant ship stealthily absconds from port and leaves the plaintiff with no *res* from which to collect, a court might determine that a judgment would be useless." *Republic Nat'l Bank*, 506 U.S. at 87 (internal quotation marks and citations omitted). Nevertheless, the Court reasoned that "the fictions of *in rem* forfeiture were developed primarily to expand the reach of the courts and to furnish remedies for aggrieved parties, not to provide a prevailing party with a means of defeating its adversary's claim for redress." *Id.* (internal citations omitted).

*Servs. of Am. v. Ancora Transp., N.V.*, 59 F.3d 879, 882 (9th Cir. 1995) ("[The *Republic National Bank* rationale] applies with equal persuasiveness to *quasi in rem* proceedings instituted under [Supplemental] Rule B."). We find the logic of *Republic National Bank* applicable in the case at bar.[9] *See Woodlands Ltd. v. Nationsbank N.A.*, 164 F.3d 628 (table), No. 97-1813, 1998 WL 682156 (4th Cir. Sept. 23, 1998) (applying *Republic National Bank* in a Supplemental Rule B maritime attachment case). Thus, even if the attachment of the THOR was vacated under Supplemental Rule E, that event would not, in and of itself, act to terminate the jurisdiction of the district court as to the Amended Verified Complaint.

As dismissal of the complaint is not a proper remedy under Supplemental Rule E, and because dismissal does not automatically flow from vacatur of Supplemental Rule B attachment, we must, as the district court endeavored to do, analyze Vitol's claims through the lens of both Supplemental Rule E and Rules 8 and 12. As the district court observed, "it is at least theoretically possible that a Complaint adequate to withstand a Rule 12(b)(6) motion may, nevertheless, not be adequate to avoid the vacatur of an attachment." (J.A. 1551). We now describe the standards under the two sets of rules and then apply those standards to the merits of Vitol's Amended Verified Complaint.

### A.    Supplemental Rule E Standard

We review the district court's order vacating the attachment of the THOR's Substitute Collateral for abuse of discretion, with legal conclusions underlying the order reviewed *de novo*. *See ProShipLine Inc. v. Aspen Infrastructures Ltd.*, 609 F.3d

---

[9]Moreover, if we were to conclude that dismissal of the complaint automatically flowed from the grant of a motion to vacate the attachment, Supplemental Rule E would effectively subsume Rules 8 and 12 in the context of admiralty and forfeiture cases. No court has extended the supplemental rules in that way and neither do we.

960, 966 (9th Cir. 2010); *Shipping Corp. of India Ltd. v. Jaldhi Overseas Pte Ltd.*, 585 F.3d 58, 66 (2d Cir. 2009).

After receiving notice of Supplemental Rule B attachment, the defendant is entitled to contest the attachment at a prompt hearing pursuant to Rule E(4)(f). To avoid vacatur of attachment, it is the plaintiff's burden to show that "1) it has a valid prima facie admiralty claim against the defendant; 2) the defendant cannot be found within the district; 3) the defendant's property may be found within the district; and 4) there is no statutory or maritime law bar to the attachment." *Aqua Stoli*, 460 F.3d at 445. "[T]he sole basis for extending this claim to [S&P] is the allegation that [S&P are] . . . alter ego[s] of [Capri Marine]. Thus, to survive this motion [to vacate], the Complaint must allege particular facts supporting [Vitol's] alter ego theory of liability to satisfy Rule E(2)(a)'s heightened pleading standard." *Arctic Ocean Int'l Ltd. v. High Seas Shipping Ltd.*, 622 F. Supp. 2d 46, 53 (S.D.N.Y. 2009).[10]

To restate a basic premise, to plead a prima facie admiralty case pursuant to Supplemental Rule E, "the complaint shall state the circumstances from which the claim arises with such particularity that the defendant or claimant will be able, without moving for a more definite statement, to commence an investigation of the facts and to frame a responsive pleading." Fed. R. Civ. P. Adm. Supp. R. E(2)(a). The burden to show why continued attachment is proper is the plaintiff's to bear. *See Equatorial Marine Fuel Mgmt. Servs. Pte Ltd. v. MISC Berhad*, 591 F.3d 1208, 1210 (9th Cir. 2010).

As we have previously explained,

---

[10]The parties dispute whether Supplemental Rule E(2)(a)'s pleading standard is still "heightened" in light of the Supreme Court's holdings in *Twombly* and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). We need not answer that question here because we conclude that Vitol has failed to carry its pleading burden under either standard.

Rule E(2)(a)'s requirement for pleading specific cir-
cumstances is one part of the process which guards
against the improper use of admiralty seizure pro-
ceedings. Thus, the rule's heightened particularity in
pleading requirement is always subject to the general
standard that the complaint sufficiently notify the
defendant of the incident in dispute and afford a *rea-
sonable belief* that the claim has merit.

*United States v. Mondragon*, 313 F.3d 862, 865 (4th Cir.
2002) (emphasis added) (internal citations, quotation marks,
and alterations omitted). While courts to have considered the
question are in agreement that the Supplemental Rule E(2)(a)
pleading requirement is "heightened," the precise boundaries
of such a heightened pleading requirement are not clearly
defined.

As one district court explained,

courts have compared the showing required in a
"reasonable grounds" analysis to the more familiar
standard of probable cause. *See, e.g.*, *Amstar Corp.
v. S/S ALEXANDROS T.*, 664 F.2d 904, 912 (4th Cir.
1981) ("A shipowner challenging the validity of an
arrest is constitutionally entitled to a prompt post-
arrest hearing in which the plaintiff has the burden
of showing probable cause for the arrest"). The
Supreme Court, interpreting the phrase "reasonable
grounds" as used in a criminal statute, has said that
"[t]he terms 'probable cause' as used in the Fourth
Amendment and 'reasonable grounds' . . . are sub-
stantial equivalents of the same meaning." *Draper v.
United States*, 358 U.S. 307, 311 (1959). Probable
cause is less than a preponderance of the evidence;
in the criminal context, it has been described as a
"fair probability" that the asserted fact is true. *Illi-
nois v. Gates*, 462 U.S. 213, 214 (1983). With this
standard in mind, courts in Rule E(4)(f) hearings

have emphasized that their conclusions are "merely holding that it is likely" that alleged facts are true. *See North of England Protecting and Indem. Ass'n*, 1999 WL 33116416, at *3.

*Wajilam Exps. (Singapore) Pte. Ltd. v. ATL Shipping Ltd.*, 475 F. Supp. 2d 275, 279-80 (S.D.N.Y. 2006).[11]

This Court has only once opined on Supplemental Rule E(2)(a)'s pleading requirement. In *Mondragon*, we expressed our agreement with the majority view, that "[Supplemental] Rule E(2)(a) requires a complaint to allege sufficient facts to support a *reasonable belief* that the property is subject to forfeiture." 313 F.3d at 865 (emphasis added).[12] We went on to explain, however, that "Rule E(2)(a) needs little interpretation. It is plainly written and means precisely what it says." *Id.* (internal quotation marks omitted).

Although Vitol asserts on appeal that the district court erred by applying a "reasonable belief" standard to S&P's motion to vacate, the court unquestionably applied the proper standard in light of *Mondragon*. The district court discussed the "reasonable belief" standard from *Mondragon*, and, as we will discuss in detail below, faithfully applied that requirement.

---

[11]Although *Wajilam Exports* describes a "reasonable grounds" standard, rather than the "reasonable belief" standard noted in our discussion of *Mondragon*, courts appear to use the two terms interchangeably to describe an identical standard for vacating an attachment. *Cf. United States v. Diaz*, 491 F.3d 1074, 1077 (9th Cir. 2007) (noting in the criminal context that "[t]he phrase 'reason to believe' is interchangeable with and conceptually identical to the phrases 'reasonable belief' and 'reasonable grounds for believing'").

[12]*Mondragon* was decided in the context of a civil forfeiture claim. However, the *Mondragon* holding was based in large part on *Riverway Co. v. Spivey Marine and Harbor Service Co.*, 598 F. Supp. 909 (S.D. Ill. 1984), an admiralty *in rem* case.

## B.   Rule 12(b)(6) Standard

We review *de novo* the grant of a Rule 12(b)(6) motion to dismiss for failure to state a claim. *McCorkle v. Bank of Am. Corp.*, 688 F.3d 164, 171 (4th Cir. 2012). To survive a motion to dismiss pursuant to Rule 12(b)(6), Vitol's "[f]actual allegations must be enough to raise a right to relief above the speculative level," thereby "nudg[ing] [its] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. 544, 555, 570 (2007).

> The plausibility standard requires a plaintiff to demonstrate more than "a sheer possibility that a defendant has acted unlawfully." [*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)]. It requires the plaintiff to articulate facts, when accepted as true, that "show" that the plaintiff has stated a claim entitling him to relief, i.e., the "plausibility of 'entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

> To emphasize the Federal Rules' requirements for stating claims that are warranted and therefore form a plausible basis for relief, the Supreme Court has held that a complaint must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. To discount such unadorned conclusory allegations, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, [556 U.S. at 679]. This approach recognizes that "naked assertions" of wrongdoing necessitate some "factual enhancement" within the complaint to cross "the line between possibility and plausibility of entitlement to relief." *Twombly,* 550 U.S. at 557 (internal quotation marks omitted).

At bottom, determining whether a complaint states on its face a plausible claim for relief and therefore can survive a Rule 12(b)(6) motion will "be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief,'" as required by Rule 8. *Iqbal*, 55 U.S. at 679 (alteration in original) (citation omitted) (quoting Fed.R.Civ.P. 8(a)(2)).

*Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009).

## C. The Alter Ego Claim

Having described the relevant pleading standards, we turn to the resolution of the merits of Vitol's alter ego claim as pled in the Amended Verified Complaint. "It is well established that an admiralty court can review questions of . . . alter ego." *Ost-West-Handel*, 160 F.3d at 174 (citing *Swift & Co. Packers v. Compania Colombiana Del Caribe*, 339 U.S. 684, 689 n.4 (1950)). "[A] corporate entity is liable for the acts of a separate, related entity only under extraordinary circumstances, commonly referred to as 'piercing the corporate veil.'" *Arctic Ocean Int'l*, 622 F. Supp. 2d at 53 (quoting *Dolco Invs., Ltd. v. Moonriver Dev., Ltd.*, 486 F. Supp. 2d 261, 271 (S.D.N.Y. 2007)). "Although decisions to pierce a corporate veil, exposing those behind the corporation to liability, must be taken reluctantly and cautiously, courts will not hesitate to take such action when justice so requires." *Keffer v. H.K. Porter Co., Inc.*, 872 F.2d 60, 64 (4th Cir. 1989) (citing *In re County Green Ltd. P'ship*, 604 F.2d 289, 292 (4th Cir. 1979)). "[I]n extraordinary cases, such as the corporate form being used for wrongful purposes, courts will pierce the corporate veil and disregard the corporate entity, treating the

parent corporation and its subsidiary as a single entity." *Corrigan v. U.S. Steel Corp.*, 478 F.3d 718, 724 (6th Cir. 2007).

In *Keffer*, as well as *DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.*, 540 F.2d 681 (4th Cir. 1976), we articulated several factors that "guide the determination of whether one entity constitutes the alter ego of another." *Ost-West-Handel*, 160 F.3d at 174. These factors include "gross under-capitalization, insolvency, siphoning of funds, failure to observe corporate formalities and maintain proper corporate records, non-functioning of officers, control by a dominant stockholder, and injustice or fundamental unfairness." *Id.* Other factors properly considered by the district court in this case include intermingling of funds; overlap in ownership, officers, directors, and other personnel; common office space; the degrees of discretion shown by the allegedly dominated corporation; and whether the dealings of the entities are at arm's length. *See Arctic Ocean*, 622 F. Supp. 2d at 53.

At its core, the question of whether to pierce the corporate veil is a fact-intensive inquiry, because "the circumstances necessarily vary according to the circumstances of each case, and every case where the issue is raised is to be regarded as *sui generis* to be decided in accordance with its own underlying facts." *DeWitt Truck Brokers*, 540 F.2d at 684 (internal quotation marks, footnote, and alterations omitted). "Instead of a firm rule, the general principle . . . has been that liability is imposed when doing so would achieve an equitable result." *Williamson*, 542 F.3d at 53 (quotation marks omitted). "In applying these factors a court must focus on reality and not form, [on] how the corporation operated and the individual defendant's relationship to that operation." *Ost-West-Handel*, 160 F.3d at 174 (citing *DeWitt*, 540 F.2d at 685) (quotation marks omitted).

Vitol alleged in its Amended Verified Complaint that Capri Marine "made no independent business decisions controlling its principle asset, the ALAMBRA," and that it lacked a busi-

ness address of its own as "it shared Starlady's address." (J.A. 1129). Further, Vitol made specific allegations that Capri Marine, by its own admission, had no appreciable assets save the ALAMBRA, despite owning unencumbered title to the ALAMBRA and operating it profitably in the years prior to the Oil Spill.

The most significant allegations, however, concern the sale of the ALAMBRA following the Oil Spill in 2001. Vitol specifically alleged that Capri Marine paid Vitol $500,000 in order to lift an injunction restraining its ability to sell the ALAMBRA. Because it lacked other assets, Capri Marine obtained the $500,000 through a loan financed by Trade Maritime in the amount of $1.4 million. Trade Maritime is part of the Kalogiratos Group. At that time, Capri Marine was essentially insolvent (save for its interest in the ALAMBRA) and facing the prospect of considerable liability arising out of the Oil Spill. It thus had little chance of repaying the Trade Maritime loan on its own.

Capri Marine sold the ALAMBRA (its sole asset) in 2001 to what appeared to be a third party, Aurora. Instead, Aurora was also part of the Kalogiratos Group under the control of Gerassimos. The ALAMBRA was later resold at a substantially higher price to a bona fide third party, and the assets of the sale were distributed throughout the Kalogiratos Group including repayment of the loan made by Trade Maritime. The district court concluded that the foregoing allegations were sufficient, for both Supplemental Rule E and Rule 12(b)(6) purposes, to have pled Capri Marine was the alter ego of Gerassimos and his related entities. For purposes of our analysis, we may assume, without deciding, that the Amended Verified Complaint does adequately plead Capri Marine as the alter ego of Gerassimos.

Even assuming that Capri Marine is an alter ego of Gerassimos, that status does not resolve the issue in the case at bar as to whether alter ego liability can attach to S&P. Rather,

Vitol must make independent allegations sufficient to avoid dismissal and vacatur that Gerassimos is the alter ego of S&P. The district court discussed the relevant alter ego allegations as to S&P and Gerassimos in the Amended Verified Complaint and concluded that "more is necessary to establish the degree of actual domination and control essential to prove an alter ego claim." (J.A. 1565). We agree with the district court's holdings both for Supplemental Rule E and Rule 12(b)(6) purposes.

In reviewing the vacatur of attachment under Supplemental Rule E, we look first to the text of that Rule. In doing so, it is clear that S&P could not, without moving for a more definite statement, "frame a responsive pleading." *See* Fed. R. Civ. P. Supp. Adm. R. E(2)(a). This is so because the facts alleged in the Amended Verified Complaint do not give rise to a reasonable belief that Primerose and/or Spartacus are alter egos of Gerassimos or his related entities.

Looking first to allegations concerning the degree to which the Starlady Fleet (unquestionably controlled by Gerassimos) was connected with the Primerose Fleet, we agree with the district court that Vitol's allegations were insufficient to pass the reasonable belief test. Vitol alleged that the Primerose Fleet, including Spartacus (owner of the THOR) was started with funds from the Starlady Fleet, as well as the allegations that Starlady vessels have similar coloration to Primerose vessels, and that Primerose shared offices, phone numbers, and other office facilities with Starlady. Vitol argues that those allegations should be sufficient to establish the alter ego status of S&P, and the district court erred in finding that "more is necessary" for Vitol to demonstrate the interconnectedness of the two shipping fleets.

These allegations of fleet interconnectedness, however, simply do not rise to the level of creating a reasonable belief to support the claim of alter ego. Applying the factors discussed above we conclude that, although Vitol has alleged a

close business relationship between Kalogiratos-controlled entities and S&P, it has not done enough to allege an alter ego status. At best, Vitol has made allegations with particularity only to support a reasonable belief that the two fleets maintain a close business relationship. Vitol's allegations that the Primerose fleet was started with funds from the Starlady fleet establish little more than that Starlady has invested in Primerose, and not how that event gives Starlady control over Primerose's affairs or establishes any ownership rights. Moreover, allegations that the fleets share similar coloration are not probative of the core question of whether the two entities have disregarded corporate formalities. And while sharing office space may be an indicium of alter ego, we do not believe that shared office space on its own is sufficient to compel a conclusion that Starlady and/or Gerassimos dominated and controlled Primerose.

Vitol has also alleged that Velliades (the alleged owner of Primerose and Spartacus) extended a line of credit to Gerassimos following the sale of the ALAMBRA. The mere extension of a line of credit from one corporate entity to another, however, does not create a reasonable belief of alter ego. Significantly, as the district court noted, the credit line was repaid. In short, that Velliades extended credit to Gerassimos does not tend to show that Velliades's business ventures are dominated or controlled by Gerassimos.

Vitol further alleged that Starlady paid $120,000 into an account held by Seatrade (a non-party owned and managed by Primerose) at Laiki Bank, and on the same day, Seatrade's loan from the same bank was discharged. Again, though, while this allegation is evidence of a close corporate relationship, and perhaps even a failure to adhere to corporate formalities, it is not evidence that funds were comingled, that Gerassimos "dominates" Seatrade (or indeed, any Primerose-

affiliated entity), or that the corporate form was in any way materially disregarded.[13]

Vitol also made an allegation that Deep Blue[14] transferred $360,000 to Starlady at the same time as Primerose transferred $10,500 to Starlady. Starlady converted these funds to Euros, then back to dollars, and transferred $306,000 back to Primerose. Vitol alleges that Velliades agreed to assist Gerassimos by transferring the funds temporarily in order to assist Starlady in obtaining favorable tax status under Greek law; but claims that there is no explanation for why Starlady only repaid $306,000 of the $370,500 originally loaned. As the district court explained, however, in light of the fact that Gerassimos owns a 5% interest in Deep Blue, the funds retained by Starlady represent an advance on dividends related to the 5% ownership stake. Again, all that Vitol has pled is that a close relationship exists between the Kalogiratos entities and those controlled by Velliades. But it has effectively alleged nothing more than repaid loans and dividend distributions, which do not establish the type of dominion and control needed to demonstrate alter ego status. Indeed, the specific facts alleged by Vitol simply establish that the two fleets maintain a close business relationship that sometimes results in the disregard of formality. But such allegations alone will not suffice to give rise to a reasonable belief of alter ego status sufficient to invoke the "extraordinary" remedy of piercing the corporate veil. *See Arctic Ocean*, 622 F. Supp. 2d at 53.

The same is true of Vitol's allegation that "Velliades is a [p]uppet of Gerassimos Kalogiratos." (J.A. 1145). This statement, without more, is clearly lacking in the particularity required to satisfy the Supplemental Rule E standard. S&P could not have responded to this bald, conclusory assertion

---

[13]The record does not reflect whether Seatrade repaid to Starlady the $120,000 deposited by Starlady into its account at Laiki Bank.

[14]The Kalogiratos family owns a minority share in Deep Blue, which is managed by Primerose.

without moving for a more definite statement. And once again, while Vitol does make certain "factual" allegations, the specific facts that Vitol does allege are not sufficient to support its legal conclusions. Indeed, many of Vitol's allegations never depart the realm of the purely speculative, including the allegation that Velliades cannot be the principal of Primerose because he "had no prior experience in ship management." (J.A. 1146). These speculative allegations simply do not meet the heightened "reasonable belief" standard.[15]

In sum, Vitol has failed to "allege particular facts supporting its alter ego theory of liability to satisfy [Supplemental] Rule E(2)(a)'s heightened pleading standard." *Arctic Ocean*, 622 F. Supp. 2d at 53. In reaching this conclusion we are mindful of the heightened pleading standard of Supplemental Rule E, and again note that courts should be "reluctant[ ]" and "cautious[ ]" when deciding to pierce the corporate veil. *Keffer*, 872 F.2d at 64.

Because Vitol has failed to plead with sufficient specificity that S&P are alter egos of Capri Marine, it has failed to carry its burden to show why the attachment of the THOR Substitute Collateral should not be vacated as the district court held. *See* Fed. R. Civ. P. Adm. Supp. R. E(4)(f) (placing burden on plaintiff "to show why the arrest or attachment should not be vacated"). We therefore conclude that the district court did not abuse its discretion in granting S&P's motion to vacate the attachment.

---

[15]Vitol does allege that Gerassimos was involved with the financing of the THOR, signing certain mortgage documents on behalf of Spartacus and directing certain loan-related documents to be sent to his attention. While we agree with Vitol that this allegation suggests some degree of cross-collateralization between the entities, we do not agree that Gerassimos' involvement with the THOR's financing makes plausible the otherwise conclusory allegation that he, not Velliades, therefore dominates Primerose and its fleet.

We next turn to the application of the Rule 8 pleading requirements discussed above to determine if Vitol pled allegations in the Amended Verified Complaint sufficient to survive Rule 12(b)(6) scrutiny. Indeed, while the Supplemental Rule E reasonable belief standard is not identical to the plausibility standard under Rule 12(b)(6), we find much of the analysis to overlap. For example, the analysis above of Vitol's allegations pertaining to fleet interconnectedness assists and informs our view of the same allegations viewed through the lens of Rule 12(b)(6).

Vitol's allegations that the Primerose Fleet was started with funds from Gerassimos and related entities, and allegations concerning fleet coloration and shared office space, are literally "factual" allegations entitled to a presumption of truth. *See Iqbal*, 556 U.S. at 681. We are not, however, required to accept Vitol's legal conclusions, drawn from those facts, as true. *See Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008) (courts "need not accept the legal conclusions drawn from the facts" stated in the complaint). This is so because, even accepting the well-pleaded facts as true, those facts do not give rise to a plausible allegation of alter ego.

As the district court recognized, taking as true Vitol's allegations of fleet interconnectness, Vitol has at best made a plausible allegation that S&P maintain a close business relationship with Gerassimos and his related entities. There is nothing in the allegations of interconnectness that plausibly suggests the sort of dominion, control, failure to observe corporate formalities, or fundamental unfairness needed to state a claim for alter ego status.

We find the same to be true with respect to Vitol's allegations of comingling of funds. Although Vitol does baldly allege that funds from Primerose were comingled with funds from Starlady, that allegation is conclusory, and not entitled to a presumption of truth. *See Iqbal*, 556 U.S. at 681. With respect to Vitol's allegations concerning the degree to which

funds were comingled, we once again identify facts in the Amended Verified Complaint that were properly pled: that Velliades extended a credit line to Gerassimos following the sale of the ALAMBRA; that Starlady paid funds to Laki Bank in exchange for discharge of certain loans to Seatrade; and that Deep Blue loaned considerable funds to Starlady, some of which were not repaid.

Again, however, when we apply the alter ego factors discussed *supra* at 27, to these facts, we find that the allegations in the Amended Verified Complaint do not plausibly state an alter ego claim. Indeed, the loans allegedly made between Gerassimos (and related entities) and Velliades (and related entities) were repaid, with the exception of a portion of the loan made by Deep Blue. But Vitol's allegations fail to account for the fact that Gerassimos owned a small share of the interest in Deep Blue, and as the district court explained, the discrepancy between the amount loaned and that repaid was properly attributable to a dividend distribution.

To the extent that these facts show a close business relationship, that allegation falls short of establishing alter ego. And because the loans were largely repaid, we do not agree with Vitol's bald allegation that these transactions represent improper comingling of funds with failure to observe the corporate form. In short, these allegations, in our view, do not contain the "factual enhancement" necessary to cross "the line between *possibility* and *plausibility* of entitlement to relief." *Twombly*, 550 U.S. at 557 (emphasis added) (quotation marks and brackets omitted).

Similarly, the statement that Velliades is a mere puppet of Gerassimos is a bald allegation, couched as fact, that is no more than an unsupported legal conclusion for purposes of Rule 12(b)(6). *See Jordan v. Alt. Res. Corp.*, 458 F.3d 332, 338 (4th Cir. 2006) ("[W]e need not accept the legal conclusions drawn from the facts, and [ ] need not accept as true unwarranted inferences, unreasonable conclusions, or argu-

ments." (internal quotation marks omitted)). As explained above, the factual support for this assertion is simply lacking, and we need not address it further.

Finally, we note that the Amended Verified Complaint is replete with examples of allegations related to whether Primerose is an alter ego of Spartacus and other members of the Primerose fleet. Vitol alleges, for example, that Primerose had "no commercially justifiable reason" to provide funds to secure the release of the THOR in the instant litigation. Besides being a further example of the speculation which we will not accept as true for either Supplemental Rule E or Rule 12(b)(6) purposes, these allegations do little to support Vitol's theory of the case: that Primerose (and its fleet member, i.e., Spartacus) is an alter ego of Gerassimos or the Kalogiratos Group.

In sum, we agree with the district court's holding that the allegations in the Amended Verified Complaint fail to state a claim upon which relief may be granted, and dismissal was therefore warranted pursuant to Rule 12(b)(6). Vitol's allegations are conclusory and contain legal conclusions couched as factual allegations. To the extent that the Amended Verified Complaint does properly allege facts, those facts do not show more than "a sheer possibility that a defendant has acted unlawfully." *See Iqbal*, 556 U.S. at 678. Because "the well-pleaded facts do not permit [this] [C]ourt to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'shown'—'that the pleader is entitled to relief.'" *See id.* at 679. As with the Supplemental Rule E analysis, we conclude the district court did not err in granting S&P's Rule 12(b)(6) motion to dismiss the Amended Verified Complaint.

## IV.   Conclusion

For the foregoing reasons, we agree that the district court properly exercised admiralty jurisdiction over Vitol's claims. Our review of the merits of Vitol's claim against S&P, how-

ever, lead us to conclude that dismissal was appropriate pursuant to Rule 12(b)(6), and the district court's *ex parte* order of attachment was properly vacated. We therefore affirm the judgment of the district court.

*AFFIRMED*